Odie DOUGLAS, Appellant,

v.

Otis R. BOWEN, M.D., Secretary of
Health and Human Services,
Appellee.

No. 86–2163.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1987.

Decided Dec. 30, 1987.

J. Michael Payne, Cape Girardeau, Mo.,
for appellant.

Joseph Moore, Asst. U.S. Atty., St. Louis,
Mo., for appellee.

Before HEANEY and McMILLIAN,
Circuit Judges, and BEAM *, District
Judge.

HEANEY, Circuit Judge.

The district court upheld a decision by
the Secretary of Health and Human Servic-
es to deny Odie Douglas disability benefits
on the basis that he could perform light or

---

* The Honorable C. ARLEN BEAM, United States
District Judge for the District of Nebraska, sit-

ting by designation.

sedentary work. We reverse and remand the matter to the district court with instructions to remand to the Secretary for payment of benefits as of April 1, 1981.

**BACKGROUND**

Odie Douglas first applied for disability benefits on July 2, 1980. The Secretary denied benefits on March 24, 1981. Douglas applied again on March 26, 1981, and the Secretary again denied benefits. On appeal from this denial, we reversed and remanded because (1) the Secretary failed to assume the burden of proving Douglas' inability to do light or sedentary work, disregarded this Court's rulings regarding subjective complaints of pain, and used the medical-vocational guidelines, even though Douglas suffers from a non-exertional impairment; and (2) the record supported the view that Douglas was not able to do light or sedentary work. *See Douglas v. Schweiker*, 734 F.2d 399, 400–01 (8th Cir. 1984).

On remand, an Administrative Law Judge (ALJ) conducted a second evidentiary hearing. A vocational expert for the Secretary, Douglas, his wife, and a friend of Douglas testified. The ALJ denied Douglas benefits on the basis that he could perform light or sedentary work in the national economy. The Appeals Council accepted the ALJ's determination with some modifications. The district court granted judgment against Douglas. Douglas appeals.

■ The question before us is whether there is substantial evidence in the record to support the Secretary's finding that Douglas had the residual functional capacity to perform sedentary or light work. The Secretary has the burden of proof on this issue. *E.g., Tucker v. Heckler*, 776 F.2d 793, 795 (8th Cir.1985). In resolving this issue, we consider: "educational background, work history, and present age of the claimant; the subjective complaints of pain and claimant's description of physical activities and impairments; the medical opinion given by treating and examining physicians; the corroboration by third parties of claimant's physical impairments; the testimony of vocational experts when based upon proper hypothetical questions that fairly set forth the claimant's physical impairments." *McMillian v. Schweiker*, 697 F.2d 215, 221 (8th Cir.1983).

■ As we stated in our earlier opinion:

Douglas was born on April 1, 1930. He has a ninth grade education and a high school equivalency diploma. Douglas worked from the time he was 14 years old until he was about fifty years old. During that 35 years, he fully supported himself and his family. His last two jobs were as a laborer for the U.S. Army Corps of Engineers from December of 1962 until April of 1970, and as a construction laborer from July, 1970 to October, 1979. He has not worked since October, 1979.

According to the testimony of Douglas, his wife, and a friend, Charles Barfield (a ranger in the Army Corps of Engineers), Douglas cannot fish, hunt or garden. He drives occasionally but only with an automatic transmission, power steering, and air conditioning. His wife occasionally must bathe him and help him get dressed. He cannot stay on his feet for more than an hour. He spends ninety percent of the time on a couch or recliner. Douglas' feet and hands often swell, usually in the middle of the day and especially upon exertion. Barfield testified that Douglas did some work for him on his farm in 1979, but that he developed severe muscle spasms as a result of the exertion. Mr. R.W. Holt wrote on February 7, 1981, that he knew Douglas to be a "good steady worker" before his health deteriorated. Holt stated that Douglas was helping him on his hog farm and his hands became so swollen that he could not hold a hand tool. Holt estimated that Douglas' hands were swollen fifty percent "over natural." His feet were also swollen "out ... over his shoes." Douglas attempted to help Mr. and Mrs. McCallister remodel their house in about 1978. They wrote that Douglas had trouble with swelling in his hands and could hardly hold a hammer.

The ALJ did not consider the letters of the McCallisters and Mr. Holt. He rejected the testimony of Douglas' wife and Bar-

field because he felt that the medical evidence did not support it. We turn now to that evidence.

## MEDICAL EVIDENCE

The medical evidence shows that Douglas suffered from a variety of maladies: arthritis and osteoarthritis, which causes swelling in his hands and feet and pain in his shoulders and hips; obesity (about 220 pounds or about 30–40 pounds overweight); high blood pressure which makes him dizzy and causes his heart to skip; probable diabetes; mild bronchitis and "moderately severe combined lung disease" probably caused by smoking up to 2–3 packages of cigarettes a day; hardened arteries; probable hypokalemia defined as "abnormally low potassium concentration in the blood ... which may be manifested clinically by neuromuscular disorders ranging from weakness to paralysis," Dorland's Illustrated Medical Dictionary 750 (25th ed. 1974); and angina pectoris defined as "a paroxysmal thoracic pain, with a feeling of suffocation and impending death, due, most often, to anoxia of the myocardium and precipitated by effort or excitement." *Id.* at 90.

Dr. Richard Gayle, one of Douglas' treating physicians, in a July 22, 1981 report, concluded that Douglas had hypertensive vascular disease; gouty arthritis and possible osteoarthritis, "mild to severe combined restrictive and obstructive pulmonary disease;" chest pains of "undetermined etiology, possibly secondary to pulmonary disease or arthritis;" possible inflammatory joint disease as "demonstrated by the range of motion chart and the patient's subjective complaints of joint pain and swelling."

Dr. Gayle stated on December 14, 1981, that "Mr. Douglas' physical inabilities are such that he is not able to engage in any form of physical activity except those involved in daily living. Also, his illnesses will gradually get worse with time." [1]

Dr. Fred Caldwell treated Douglas on numerous occasions. After an examination on January 19, 1982, he concluded:

I have written four letters in the past stating that he was unable to work at his usual capacity and evidently this is not worded properly and therefore it needs to be worded that he can never be gainfully employed.

Dr. Mark Bauman examined Douglas for the Secretary on February 14, 1984. He noted no evidence of joint abnormality or swelling of the joints, although he noted mild degeneration in the joints. He reported a full range of motion in the joints, except in the hips, back and shoulders. Exercise tests did not indicate a likelihood of coronary disease; x-rays showed no cardiomegaly or active pulmonary disease (although pulmonary tests showed moderate chronic obstructive pulmonary disease). There was no clinical evidence of a respiratory impairment, other than marked dyspnea on exertion. He did not give an opinion as to Douglas' ability to perform light or sedentary work.

On January 25, 1984, Douglas went to the out-patient clinic at a Veteran's hospital, complaining of a sore throat. Rec. at 374. On February 22, 1984, Douglas returned. The doctors reported that he had hypertension, obesity and asthmatic bronchitis. Douglas was told to continue taking the numerous medications which had been prescribed.

Both the ALJ and the Appeals Council reject the statements of Douglas' treating physicians in preference for Dr. Bauman's, giving as the primary reason that Dr. Bauman's opinion was based on the objective medical evidence in the record and that the other opinion evidence was not. We find no support for this conclusion in the record.

First, Dr. Gayle and Dr. Caldwell gave opinions on whether Douglas could do light or sedentary work. Dr. Bauman did not. There is, thus, no statement in the record

---

1. In 1984, in response to the question by the Secretary: "Have you restricted this patient's activity due to chest pain?" Dr. Gayle said that Douglas was "not to engage in strenuous activities." (Rec. at 388). The question did not address Douglas' overall ability to engage in activities. We, therefore, cannot view Dr. Gayle's answer as a qualification of his statement of December 14, 1981, especially because his diagnosis of Douglas' physical impairments had not changed.

by a doctor that Douglas has the physical ability to do light or sedentary work.

Second, contrary to the statements of the ALJ, there is medical evidence, other than lay testimony, that Douglas suffered from debilitating swelling and pain in his ankles, hands, hips and back. Dr. Caldwell, who examined Douglas more than twenty times between October of 1979 and December of 1980, repeatedly stated that Douglas suffered from arthritis of the joints. He does not suggest that Douglas exaggerates his pain or that it is not traceable to his arthritis. Nor does Dr. Caldwell express any doubt that Douglas' hands and feet swelled due to arthritis. Moreover, he notes affirmatively that Douglas' hands swelled due to arthritis. Finally, an interviewer for the Social Security Administration noted on December 29, 1983, in a personal interview with Douglas that his hands were swollen.

Dr. Bauman did not notice swelling around the ankles or hands during the examination on February 14, 1984. Douglas, however, had never claimed that his joints were constantly swollen, but only that they became swollen after exertion or in the morning or evenings. Dr. Bauman did note a "great" showing of tenderness when Douglas flexed at the hips.

X-rays showed mild degenerative damage in Douglas' back, shoulders and hips. The range of motion charts showed that his lateral flexion in his cervical spine was 30 degrees, both right and left, with 40 degrees being normal. The dorsolumbar flexion extension was limited to 70 degrees, with 90 degrees being normal. For his shoulders, internal rotation was 30 degrees, with 40 degrees being normal. External rotation was 80 degrees, with 90 degrees being normal. Forward elevation and abduction were both 90 degrees, with 150 degrees being normal. Finally, forward flexion in his hips was 80 degrees, with 100 degrees being normal. Backward flexion was 20 degrees, with 30 degrees being normal. Abduction was 30 degrees, with 40 degrees being normal.

Moreover, the doctors unanimously concluded that Douglas suffered from "moderate chronic obstructive pulmonary disease," which may have caused the pain in his chest and exacerbated his pain from arthritis. Douglas also clearly had hypertension, although it was subject to some control. His blood pressure fluctuated from 132/92 to 180/112. Finally, Douglas was clearly obese, being approximately thirty to forty pounds overweight.

In general, the doctors do not dispute the objective medical evidence, at least with regard to the existence of hypertension, arthritis, osteoarthritis, pulmonary disease and obesity. Dr. Bauman's report is not markedly different from certain isolated reports of Dr. Gayle and Dr. Caldwell. Dr. Bauman does not draw any conclusion from the evidence as to Douglas' capacity to perform light or sedentary work. Dr. Gayle and Dr. Caldwell, on the other hand, conclude that Douglas cannot perform the activities necessary for such work. They base their conclusions on numerous examinations of Douglas. To the extent that Dr. Bauman's conclusions differ from Caldwell's and Gayle's, deference must be given to the treating physicians' opinion, where it is corroborated (as it is here) by the testimony of lay witnesses and the claimant's work history. *See Ragsdale v. Secretary of HEW*, 623 F.2d 528, 530 (8th Cir.1980). Moreover, we must accept Douglas' complaints of subjective pain, since we cannot find them inconsistent with the record as a whole. *See Herbert v. Heckler*, 783 F.2d 128, 130 (8th Cir.1986) (interpreting *Polaski v. Heckler*, 751 F.2d 943 (8th Cir.1984), *vacated and remanded on other grounds*, — U.S. —, 106 S.Ct. 2885, 90 L.Ed.2d 974, *reinstated*, 804 F.2d 456 (1986), *cert. denied*, — U.S. —, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)).

## VOCATIONAL TESTIMONY

Because no doctor performed tests, such as a physical capacities assessment, which clearly established that Douglas could not perform light or sedentary work as defined by the regulations, 20 C.F.R. § 404.1567, a vocational expert could establish that, even with his physical limitations, Douglas could perform certain kinds of light or sedentary work. At the hearing on November 6,

1984, a vocational expert, Dr. John E. Grenfell, appeared on behalf of the Secretary. Dr. Grenfell testified that Douglas' work was unskilled and that Douglas had no transferrable skills. The ALJ asked Grenfell two hypothetical questions: one in which he construed the evidence in the claimant's favor and the other in which he construed the evidence in the Secretary's favor. In response to the first, Dr. Grenfell answered that Douglas could not do heavy work, but he was not asked whether Douglas could do light or sedentary work.

In the second, the ALJ asked Dr. Grenfell whether Douglas could perform light or sedentary work. Dr. Grenfell responded:

> With the limitations imposed in your hypothetical, if the—he has periodic swelling and he has pains in his hips and ankles, however, if this pain is relieved by over-the-counter medications to a point where he is able to sit for two hours at a time and that he had some limitations in his hands or some deformity of the little finger but the rest of the hands are not seriously affected. That is does not have any deformities, he'd not be able to engage in work involving fine finger dexterity. If he has no evidence of pulmonary disfunction [sic] except shortness of breath upon exertion, then he would be able to engage in unskilled and semi-skilled light and sedentary work activities.

■ From the vocational expert's restatement of the hypothetical, it is clear that the hypothetical did not properly characterize the medical evidence. First, Douglas took drugs other than over-the-counter medications for pain, such as Motrin. Second, the evidence clearly shows that Douglas suffered from hypertension and a moderate pulmonary impairment. The hypothetical mentions neither of these. Third, the hypothetical does not adequately characterize the extent of Douglas' arthritis and osteoarthritis. Fourth, the hypothetical mentions that Douglas could sit for two hours. This conclusion is based *solely* upon the ALJ's observations at the hearing, which is an improper basis because it

is not corroborated by any of the other evidence. *See Lanning v. Heckler*, 777 F.2d 1316, 1317 (8th Cir.1985) ("ALJ may not reject a claimant's subjective complaints solely on the basis of personal observations."). We cannot accept as substantial evidence a hypothetical which does not precisely state to the expert the claimant's condition. *See Bradley v. Bowen*, 800 F.2d 760, 763 n. 2 (8th Cir.1986).

Finally, the vocational expert conceded that "[i]f [Douglas] had an absentee rate in excess of one or two days a month, he'd not be able to work in any" of the sedentary or light jobs described by the vocational expert. Any conclusion that Douglas could work at a job without having more than one or two absences due to his various impairments is not supported by substantial evidence.

## CONCLUSION

Residual functional capacity is "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Lanning*, 777 F.2d at 1318 (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)). Here, Douglas' subjective complaints were corroborated by lay testimony and reports of treating physicians. His impairments had medically determinable origins. The treating physicians concluded that Douglas could not do any kind of work on a day-to-day basis. No doctor disputed this. The vocational expert conceded that if Douglas had more than two absences a month due to his impairments, he could not find work in the national economy. The evidence clearly shows that Douglas would have more than two absences a month due to his various impairments. For these reasons, we reverse the district court and remand with instructions to the Secretary to grant Douglas benefits as of April 1, 1981.