Lillian THOMAS, Appellant,

v.

Louis W. SULLIVAN, M.D.,* Secretary of Health and Human Services, Appellee.

No. 88–2171.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1988.

Decided June 6, 1989.

---

\* Louis W. Sullivan, M.D., succeeded Otis R. Bowen, M.D., as Secretary of Health and Human Services on March 1, 1989. Pursuant to Fed.R. App.P. 43(c)(1), he is substituted as appellee.

Anthony W. Bartels, Jonesboro, Ark., for appellant.

Joyce Shatteen, Dallas, Tex., for appellee.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

ARNOLD, Circuit Judge.

Lillian Thomas appeals from the judgment of the District Court affirming the decision of the Secretary denying her claim for disability benefits. Because the denial of benefits was not supported by substantial evidence, we reverse.

### I.

At the time of this appeal, Lillian Thomas was a thirty-nine year-old black woman with a tenth-grade education. She lived with her two teen-age sons in a two-bedroom HUD-supported apartment. The family survived on food stamps, AFDC, and an occasional $50.00 a month in child support. Thomas is married, but her husband abandoned the family more than ten years ago, and she is unsure of his whereabouts. Thomas also has a grown daughter, who no longer lives at home. Last employed in the late 1960s, when she worked as a hotel maid, and then for six months as a nursing-home aide, Thomas quit working because her feet and legs swelled, making it painful for her to stand, Tr. 58, and because her back hurt because of kidney problems, Tr. 59.

Thomas has numerous physical and mental ailments. She suffers from hypertension, which is controlled by medication, and adult-onset diabetes, which is not well-regulated. She complains of swelling in her legs and feet, which makes walking more than a block, standing more than five to ten minutes, and sitting more than 30 minutes painful. Tr. 70. Thomas has been massively obese all of her adult life, Tr. 340, but claims she cannot diet because she cannot afford to buy the right foods. Tr. 69. She also complains of kidney problems which manifest themselves in back pain and frequent urination. Tr. 59, 68, 184.

Thomas has been visiting mental-health clinics in her area since 1972 for treatment of "nerves." Her diagnosis in the early 1970s was depressive reaction in a hysterical personality. Tr. 173. However, there was a suspicion at that time that she was clinic-shopping in search of a doctor who would give her tranquilizers. Tr. 176. She was still going to mental-health clinics in the early 1980s, when she was diagnosed as having obsessive thoughts and a sleep disturbance. Tr. 163. In 1984, Sinequan, an anti-anxiety and anti-depression drug, was prescribed for her and she was labeled as suffering from a dysthymic, or mood, disorder. Tr. 181. In August of 1985, she was given a variety of personality and intelligence tests, which revealed she had an IQ of 71 and a fifth-grade reading ability. Tr. 256. Her diagnosis was modified to borderline intellectual functioning, dysthymic disorder, and schizotypal personali-

ty disorder.[1]

In October of 1985, Thomas was voluntarily admitted into the hospital overnight when she told a therapist that "something tells me to kill my kids." Tr. 269. Thomas was given a prescription for Mellaril, an anti-psychotic drug, and atypical psychosis was added to her diagnoses. *Id.* A treatment program was devised for Thomas which included group therapy and anti-psychotic medication. The medication has controlled her psychotic symptoms. Tr. 271, 280. However, Thomas's attendance at therapy has been sporadic, *e.g.*, Tr. 281, 287, 321–28, and her participation when present has been minimal. Tr. 279, 282, 320. Social workers have been sent to her home to follow up on her non-attendance. Tr. 330. Thomas explains that she does not attend therapy when she doesn't feel well physically, which is most of the time. *Id.*

The most recent medical evaluation of Thomas is a January 19, 1987 letter from Dr. Ashley, an internist. Tr. 340. He reports that she had been under treatment at a mental-health clinic for two or three years, and had attempted suicide by threatening to shoot herself six months ·prior. *Id.* He gives the clinic's diagnosis as mental retardation, depression, borderline intellectual functioning, and schizoid personality.[2] Dr. Ashley notes that Thomas was still taking Mellaril, as well as high blood pressure and diabetes medication. He confirms that Thomas has "bladder trouble," caused by chronic cystitis. Though conceding that "[i]t is difficult to find a single disabling disability here in as much as her diabetes is without complication [, and h]er hypertension is without serious complications and is treatable," Dr. Ashley none-

theless concludes that Thomas is "totally disabled in her present situation." Tr. 341.

Thomas filed for benefits in 1984. After a hearing before an ALJ, her claim was denied in 1985. She requested and received a supplemental hearing in 1986, and her claim was again denied. At her first hearing, Thomas testified that during the day she did the housework and cooking with help from her sons, watched TV, and slept. Tr. 66–67. She told the ALJ that she attended church twice a week. Tr. 67. Thomas stated that she had never learned to drive and so had no driver's license. If she needed to go to the doctor, she had to pay someone to take her. Tr. 74–75. At the second hearing, Thomas testified that she attended church only once a week, and no longer cleaned her house because her feet swelled too much. Thomas said her sister now came over to cook, wash dishes, and do the laundry for her. Tr. 87. She added that she had many friends, and spent much time talking to them on the phone. Tr. 89.

In explaining his decision to deny benefits, the ALJ pointed to Thomas's daily activities, her youth, and her lack of serious physical restrictions. Specifically, the ALJ stated that Thomas "maintains a wide range of social contacts and has not exhibited any reclusive behavior" and that "she is able to live alone" despite a "longstanding personality disorder." Tr. 17. He also noted what he perceived as a contradiction between her testimony at the hearing and her responses on a social-security questionnaire: Thomas testified that her sister did most of the cooking, while on the questionnaire she indicated that she did the cooking. Tr. 206. The District Court affirmed

---

1. "Borderline intellectual functioning" describes people with IQ's between 71 and 84. To put the term in perspective, the Social Security Administration considers a person with an IQ of 59 or less presumptively disabled, and a person with an IQ between 60 to 69 with some other physical or mental impairment imposing work-related limitations presumptively disabled. 20 C.F.R. Part 404, Subpt. P, App. 1, 12.05 B. & C. "Schizotypal personality disorder" is a pervasive pattern of lack of ability to relate to other people and peculiarities in thought, appearance, and behavior beginning in early adulthood.

2. "Schizoid personality" describes a person with a pervasive pattern of indifference and restricted range of emotional experiences and expressions.

Curiously, despite having access to the mental-health clinic's diagnosis, Dr. Ashley points to Thomas's "lifelong personality maladjustment, borderline mental function and history of marked emotional swings" and concludes she is manic-depressive. *Id.* at 341.

the ALJ's decision, but observed that "it might reach a different result ... if it were trying this case de novo, chiefly because of the Secretary's contention that [Thomas's] ability to do some household work, *e.g.*, cooking for one hour per day, demonstrated her ability to work." *Thomas v. Bowen,* No. J–C–87–83, slip op. at 5 (E.D.Ark. July 20, 1988). The Court cautioned the Secretary against undue reliance on such evidence in the future. *Id.*

## II.

■ In reviewing the Secretary's decision to deny disability benefits, we look to see whether the decision is supported by substantial evidence in the record as a whole. *McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983). This review is more than a rubber stamp for the Secretary's decision, and is more than a search for the existence of substantial evidence supporting his decision. *Id.* Indeed, we must take into account evidence in the record which fairly detracts from his decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). After reviewing the Secretary's decision under this standard, we must reverse.

As noted earlier, the ALJ based his decision on the fact that Thomas lived alone, caring for herself and her children, despite her mental illness. He put much weight on her statements on a social-security questionnaire, where she admitted she cooked and cleaned, shopped for groceries, did the laundry, visited with friends, attended church, and went fishing. He discounted her later testimony that she no longer performed these tasks, or performed them only with help from her sister or sons. We disagree with his analysis of her daily activities.

■ First, we note that a claimant need not prove she is bedridden or completely helpless to be found disabled. *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 41 n. 6 (2d Cir.1972); *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir.1963). Second, we remind the Secretary that to find a claimant has the residual

functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). Substantial gainful activity means the performance of substantial services with reasonable regularity either in competitive or self-employment. *Markham v. Califano,* 601 F.2d 533, 534 (10th Cir.1979). The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity.

Furthermore, we think that Thomas's testimony at the hearing is not inconsistent with her written responses on the questionnaire. The cooking Thomas alludes to on the social-security form consists of pouring cereal and orange juice for herself and her sons for breakfast in the morning and preparing dinner with the help of her sons in the evening. She does not make lunch, since she is supposed to be on a diet, and the boys are away at school. Tr. 206. The cleaning she mentions is done three times a week, and is largely performed by her sons. On the questionnaire, Thomas admits to doing only the vacuuming by herself. *Id.* Grocery shopping is done twice a month, and with the help of her sons. *Id.* Laundry, also performed twice a month, seems to be the only other task Thomas completes unaided. She requires assistance to get to the laundromat, but once there she washes clothes on her own. *Id.* While Thomas does state on the form that she enjoys fishing, and goes two to three times a month in the summertime, Tr. 209, fishing is hardly a stressful activity. Thus, on the social-security questionnaire, Thomas claimed to perform only limited household chores, and to undertake them with assistance. This is not very different from her testimony at the hearing. But even if we were to disregard her testimony entirely, and rely solely on her responses on the form, the few daily activities listed would not persuade us she has the capacity to do

670

substantial gainful activity. The Secretary concedes that the burden of proof is on him on this issue, since there is clearly no past relevant work that Thomas is able to perform.

While it is true that no one of Thomas's complaints is disabling, we think that when they are viewed together, and in conjunction with how they limit her daily activities, they add up to an inability to do real work. Thomas's borderline intellectual functioning, poor physical condition, and mental illness combine to disable her.

According, we reverse the judgment and remand this case to the District Court with directions to remand to the Secretary for an award of benefits in the appropriate amount.

It is so ordered.