**Garnet MORSE, Plaintiff–Appellant,**

v.

**Donna E. SHALALA,[1] Secretary of Health and Human Services of the United States, Defendant–Appellee.**

No. 93–1016.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1993.

Decided Feb. 14, 1994.

Before MAGILL, Circuit Judge, LAY and BRIGHT, Senior Circuit Judges.

ORDER

**Garnet MORSE, Plaintiff–Appellant,**

v.

**Donna E. SHALALA,[1] Secretary of Health and Human Services of the United States, Defendant–Appellee.**

No. 93–1016.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1993.

Decided March 3, 1994.

Order Granting Rehearing En Banc and Vacating Opinion April 5, 1994.

1. Donna E. Shalala has been substituted for Louis W. Sullivan pursuant to Fed.R.App.P. 43(c)(1).

1. Donna E. Shalala has been substituted for Louis W. Sullivan pursuant to Fed.R.App.P. 43(c)(1).

866

Counsel who presented argument on behalf of the appellant was John A. Bowman, Davenport, IA.

Counsel who presented argument on behalf of the appellee was Richard L. Richards, Des Moines, IA. Additional attorneys appearing on the brief were Gene Shepherd and Christopher Hagen.

Before MAGILL, Circuit Judge, LAY and BRIGHT, Senior Circuit Judges.

LAY, Senior Circuit Judge.

Garnet L. Morse appeals from the district court's[2] order affirming the Secretary of

2. The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

Health and Human Services' ("the Secretary") denial of Ms. Morse's application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c (1988 & Supp. III 1991). This is her fourth application: She filed her previous applications in 1984, 1988, and 1989. Each application was denied throughout the administrative process. Although the claimant asserts disability since 1975, the denial of her latest application on September 25, 1989, remains binding and her present claim filed on March 14, 1990, required the Secretary to determine her disability on the basis of evidence obtained since September 25, 1989. Her past history, prior to September 25, 1989, is referred to for foundational purposes only. The Administrative Law Judge ("ALJ") granted the claimant a hearing on February 27, 1991, and subsequently denied her claim. The appeals council denied a request for review. Upon petition for review, the district court found that there existed substantial evidence on the record as a whole to support the Secretary's denial of the claim. We reverse and remand.

## I.

Ms. Morse was forty-eight years old at the time she filed her fourth application for SSI benefits. She has completed the eleventh grade, has a very limited work history, and her only past relevant work is that of a sandwich maker. Since 1975 she has had recurrent cardiac, pulmonary and low back problems and has undergone surgery for her cardiac condition. She has had at least two hospitalizations for both her pulmonary and low back problems since the time when her third application was denied in September of 1989.

In March of 1989, her treating physician, a certified board internist, Dr. Wilson L. Davis, summarized her past and present diagnosis as follows:

Mrs. Morse's current diagnoses include: rheumatic heart disease with severe mitral stenosis, status post mitral commissurotomy; left lower extremity radiculopathy probably secondary to protruding disc; congestive heart failure compensated on limited activity and medication; chronic

atrial fibrillation; history of angina pectoris; history of depression; history of frequent pneumonias and episodes of asthmatic bronchitis.

This diagnosis was confirmed in a letter to Dr. Davis from a consulting physician, Dr. Charles McKay, at the University of Iowa Hospitals and Clinics ("UIH"). After examining Ms. Morse in December of 1989, Dr. McKay's diagnosis of Ms. Morse was:

Your patient was seen in the Cardiology Clinic on December 27, 1989 with the following diagnoses: 1) rheumatic mitral stenosis, status post valvuloplasty on August 18, 1989 and commissurotomy in 1976; 2) chronic atrial fibrillation with periodic pulmonary edema; 3) status post cholecystectomy; 4) L4 and L5 disc narrowing with low back and left leg pain; 5) chronic urinary tract infections of Klebsiella.

On September 18, 1990, Dr. Davis presented a final diagnosis of the claimant after a week-long period of hospitalization in which he observed:

FINAL DIAGNOSIS:

1. Severe back and left leg pain due to bulging L5–S1 discs exacerbated by a recent fall with associated muscle spasm.
2. Rheumatic heart disease with mitral stenosis, status post mitral valve commissurotomy in 1976 and balloon valvuloplasty in May 1990.
3. Congestive heart failure.
4. Atrial fibrillation.
5. Moderate appearing mitral regurgitation and mild aortic and pulmonic regurgitation.
6. History of depression.
7. Status post cholecystectomy.

At that time, Dr. Davis opined that as of May 29, 1990, Ms. Morse was still suffering from congestive heart failure. He added:

I believe that Mrs. Morse is disabled as far as regular work is concerned. She would be restricted from lifting more than perhaps 20 pounds and would be unable to carry even smaller amounts more than a few feet at a time. She does not appear to be restricted as far as standing, moving about and sitting but would be limited as

far as walking because of her mitral valvular disease and her congestive heart failure. She would have considerably limited stooping, climbing, kneeling and crawling and could not be expected to do this in a job situation because of her lumbar disc disease which continues to cause continuous pain even when she is resting.

I do not believe Mrs. Morse has difficulty with handling objects, seeing, hearing, speaking or traveling. She could not be exposed to environments involving fumes, high or low temperatures or hazards such as climbing or being in high places because of her heart disease.

On December 29, 1990, Dr. Davis observed:

Mrs. Morse was admitted to the hospital on 10/30/90 and discharged on 11/5/90. I am enclosing a copy of the discharge summary. I believe that this hospitalization again reflects the fact that Mrs. Morse has several medical problems and although she is able to function moderately well under the best of circumstances *even a small perturbation from normal* may lead to significant decompensation in her overall condition.

I subsequently saw Mrs. Morse on 11/13/90. She showed good improvement in her back pain although she continued to have muscle tenderness. It was noted that she continues to be followed at University of Iowa Hospitals for her heart condition which I consider to be only marginally compensated. It continues to be my belief based on this and previous exposure to this patient that she is disabled from both a cardiac and a lumbar disc perspective. (emphasis added)

We deem it appropriate in view of the denial of the claim that her progress notes prepared by Dr. Davis be set forth in the margin. Although these notes begin in 1986, we include material portions of this history subsequent to September 1989.[3]

3. Dr. Davis's progress notes are set forth at volume two of the Appendix at pages 957–61:

September 5, 1989
S. Generally feeling tired since being hospitalized at UIH where she had mitral valvuloplasty. She continues to have her leg pain. She has easy fatigability but no orthopnea, PND or edema.
O. The lungs are completely clear. Heart is irregular with a diastolic rumbling murmur at the apex.
A. 1. Mitral stenosis with recent valvuloplasty and increase in area by echo from 0.8 to 1.5cm2.
2. Severe CHF secondary to #1 now doing fairly well on Lanoxin and salt restriction only.
3. Left leg pain due to disc problem.
P. 1. Resume salsalate 750mg two b.i.d.
2. Halcion 0.25mg at hs prn as necessary. I discouraged regular use of this.
3. Pro time today and return in one month or prn.
October 6, 1989
S. Complains of pain in the dorsum of the foot over the area of the superficial vein. Also her usual pain in the lateral leg. She complains of being tired and weak all the time. Her disability application was again rejected.
O. There is tenderness over the dorsum of the foot. The vein compresses easily and does not appear to be inflamed.
A. 1. Left foot and leg pain all of which is due to her sciatica.
P. 1. Support hose prn.
2. Warm soaks and hot pad prn. Elevate the foot as needed.

3. Serum potassium today as she has restarted her Lasix and potassium because of dyspnea and fluid retention.
4. Return in two months or prn.
October 26, 1989
S. Dry cough and dyspnea. Feels that she is "suffocating from the inside."
O. The lungs are completely clear. No rales. No edema or JVD. Heart reveals grade 2/6 systolic murmur at the apex and a grade 2/6 diastolic murmur also at the apex.
A. 1. Bronchitis with some improvement over the last two weeks still symptomatic.
2. Mitral stenosis s/p recent valvuloplasty.
P. 1. Doxycycline 100mg b.i.d. × 1 week Rx × 1.
2. Proventil inhaler 2 puffs q.i.d. prn.
December 14, 1989
S. Complains of cough productive of brownish greenish sputum and aching all over. She also noted a rash on her chest.
O. There is an erythematous rash on the chest. The lungs are essentially clear. Heart is unchanged.
A. 1. Acute bronchitis.
2. Mitral stenosis s/p valvuloplasty.
P. 1. Doxycycline 100mg b.i.d. for ten days.
2. Return as previously scheduled.
December 21, 1989
Patient didn't show for pro time 12/19. Spoke with patient's sister today. She reports that Garnet has been very depressed, crying. Mentioned taking 3 sl. pills yesterday.
February 23, 1990
S. Feeling tired and having difficulty with her back exercise because of worsening pain. She has been quite depressed and not sleeping well.

## II.

In reviewing the ALJ's decision to deny disability benefits, we must ascertain "whether there is substantial evidence on the record as a whole to support" the Secretary's decision. *Hutsell v. Sullivan,* 892 F.2d 747, 748–49 (8th Cir.1989). This review involves more than a search of the record for evidence supporting the Secretary's findings; the substantial evidence test requires that we take into account evidence that fairly detracts from the Secretary's decision. *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989).

A. 1. Low back pain due to disc disease being followed at UIH.

2. Mitral stenosis s/p balloon valvuloplasty actually doing fairly well now.

3. Depression.

P. 1. Add amitriptyline 10mg at hs for three days and then 20mg at hs. Call with a progress report in one to two weeks and return in one month.

2. OC 7. The patient is craving ice and is fatigued and I think needs a follow up blood profile.

3. Continue monitoring pro times and return in one month for follow up. She is to go to UIH about March 21 to see Cardiology and Orthopedics.

March 29, 1990

S. Depressed but otherwise stable. She did not notice any change with amitriptyline. She is using Slimfast and trying to lose some weight. She was seen at UIH recently and they said there [was] no change in her valve. She continues to have left leg and foot pain.

O. There is a diastolic rumble and a grade 2/6 holosystolic murmur at the apex. The heart is irregular. The lungs are clear.

A. 1. Mitral stenosis and regurgitation stable clinically.

2. Depression.

3. Chronic sciatica due to disc disease.

P. 1. Prozac 20mg q AM.

2. Return in one month to review her progress on this drug. She also is followed at UIH in Orthopedics and Cardiology.

May 14, 1990

S. Generally feeling well except for continued fatigue and lethargy. She is sleeping very poorly at night.

A. 1. Rheumatic heart disease.

2. Insomnia. She was not helped at all by Prozac.

P. 1. DC Prozac.

2. Dalmane 15 mg at h.s. prn # 15 R × 1.

3. Return in July for annual exam with PCP to be done with the pro time prior to that exam.

June 11, 1990

S. Follow up of hospitalization. Her breathing is improved although she continues to have dyspnea on exertion. Her cough has com-

An individual is considered to be impaired if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to ... last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The physical or mental impairment must be of such severity that the applicant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the na-

pletely cleared. She continues to have pain in the left buttock and left foot but her current, less strenuous exercises seem to be working somewhat better.

O. The lungs reveal a few bibasilar rales. Heart is irregularly irregular with a grade 2/6 systolic murmur at the apex and a 1/6 diastolic rumble at the apex.

A. 1. Recent hospitalization for bronchitis and decompensation of her congestive heart failure now doing better on increased diuretics.

2. Mitral stenosis s/p balloon valvuloplasty. The patient continues to be compensated in the resting state but any infection or exertion leads immediately to decompensation. This has been repeatedly demonstrated and has required hospitalization several times for clinical and radiologic decompensation of her CHF.

P. 1. Continue current meds as per profile including increased dose of furosemide 80mg daily.

2. She is on increased potassium at 20mg b.i.d.

3. Apparently she has received a denial of disability benefits. I believe that she is not a candidate for being gainfully employed. I will contact Dr. Charles McKay at UIH, the cardiologist regarding this. The patient will return in about six weeks for routine follow up.

July 16, 1990

\* \* \* \* \* \*

A. 1. Mitral stenosis clinically moderately severe.

2. History of chest pain.

3. History of chest paid with normal coronary arteries per recent angiography.

4. Congestive heart failure on a valvular basis.

5. History of low back and left leg pain due to L4 5 disc disease being treated conservatively by the spine center at UIH.

P. 1. Pap, hemocculis × ___. The patient did not want mammograms this year.

2. Continue current medication without change. Continue Coumadin at 3mg at h.s. with a pro time tomorrow and then on a regular basis and see me in two months or prn.

tional economy." *Id.* § 1382c(a)(3)(B). If the applicant asserts that she has multiple impairments, the Act requires the Secretary to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 1382c(a)(3)(F).

■ A five step sequential analysis is followed in determining whether a claimant is disabled. *See* 20 C.F.R. § 416.920 (1993). The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled. The fourth step asks if the claimant's impairments prevent her from doing past relevant work. If the claimant can perform past relevant work, she is not disabled. The fifth step involves the question of whether the claimant's impairments prevent her from doing other work. If so, the claimant is disabled. Once the applicant demonstrates, under the fourth step, impairments that prevent her from returning to her previous work, the burden shifts to the Secretary to prove that jobs exist in the national economy that the applicant could perform. *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991).

The Secretary found that the claimant's disability did prevent her from performing her past relevant work as a sandwich maker. Based upon the ALJ's assessment of her disability and the vocational expert's response to hypothetical questions, however, the ALJ held that notwithstanding the claimant's severe impairment she had sufficient residual functional capacity to perform other substantial gainful work within the national economy. Thus, the claimant was denied benefits because of the ALJ's findings on the fifth step of the sequential analysis under 20 CFR § 416.920.

In assessing the claimant's disability, the ALJ rejected her subjective complaints of disability, shortness of breath, chest pain,

lower back pain and occasional leg pain. The ALJ, although agreeing that the claimant suffered from a "severe" impairment, nevertheless rejected the treating physician's opinion that the claimant was "disabled" under the Act. The ALJ reasoned:

> Although [Dr. Davis] opined the claimant was "disabled" at Exhibit B–86, he went on to note the claimant could lift up to 20 pounds, could carry less than 20 pounds, and had unlimited abilities to stand, sit, and move about. Clearly, his thoughts as to what makes a person "disabled" do not coincide with the statutes and regulations governing the Social Security Administration. Furthermore, the claimant's treating physicians at the University of Iowa Hospitals and Clinics have not opined the claimant is disabled because of her cardiac and back problems. Indeed, at Exhibit B–77, the claimant was reported as being only somewhat limited by her cardiac disease and lower back pain, and at Exhibit B–93 was reported as having only mild pulmonary disease which was not limiting and significant cardiac disease which was only mildly limiting. Accordingly, the undersigned discounts the opinion of Dr. Davis that the claimant is "disabled."

The ALJ further found that the claimant's daily activities were inconsistent with disability. Based upon a hypothetical question, the vocational expert opined that there were approximately 500 positions available in Iowa and 25,000 positions available nationwide that the claimant could perform.

■ We find that there does not exist substantial evidence on the record as a whole to substantiate that the claimant possessed sufficient residual functional capacity to perform substantial gainful activity under the fifth sequential step. In reviewing the record as a whole, we find that the Secretary presented no medical evidence that contradicts Dr. Davis's opinion regarding the claimant's disability. Dr. Davis has treated the claimant since 1986. He utilized the reports from the specialists at the University of Iowa Hospitals and Clinics in making his evaluation. In formulating the hypotheticals and reaching the conclusion that Ms. Morse is not

disabled, the ALJ discredited Dr. Davis's findings, and mistakenly believed that Ms. Morse's ability to do light housework was inconsistent with disability. The ALJ also held the claimant's limited work history against her. In addition, the Secretary improperly rejected the claimant's subjective pain, notwithstanding the hospital's medical records which overwhelmingly support these findings.

### A. Ms. Morse's Subjective Complaints of Pain

In assessing the claimant's disability and formulating the hypothetical questions posed to the vocational expert, the ALJ rejected Ms. Morse's subjective complaints of pain. Specifically, the ALJ found: "The allegations of the claimant regarding her subjective complaints of disabling shortness of breath, chest pain, lower back pain, and occasional leg pain are not found to be credible for the reasons discussed in the body of this decision." The ALJ's decision does not, however, reveal the reasons for discounting Ms. Morse's complaints. Regarding Ms. Morse's complaints of lower back pain and left leg pain, the ALJ simply states that "there is no evidence of significant limitation of motion" and "the claimant has experienced only a moderate restriction of activities of daily living." As far as shortness of breath and chest discomfort, the ALJ notes that at one point the claimant stated that she experienced only some shortness of breath and chest discomfort.

■ As we have explained on numerous occasions, for an ALJ to reject a claimant's subjective complaints of pain, the ALJ must "make an express credibility determination explaining his reasons for discrediting the complaints." *Ghant v. Bowen,* 930 F.2d 633, 637 (8th Cir.1991); *see also Delrosa v. Sullivan,* 922 F.2d 480, 485 (8th Cir.1991); *Prince v. Bowen,* 894 F.2d 283, 286 (8th Cir.1990). Furthermore, because evidence of such pain is frequently subjective and difficult to evaluate, we do not require direct medical evidence linking the physical problems and the subjective complaints of pain. *See Tucker v. Schweiker,* 689 F.2d 777, 780–81 (8th Cir. 1982) (per curiam). Rather, the ALJ is to

expressly determine if the claimant's complaints are credible.

■ In the present case, the ALJ failed to explain why he chose to reject Ms. Morse's complaints. Although the ALJ is in the best position to make credibility determinations, he is not given unfettered discretion to dismiss subjective complaints of pain without providing some basis for this decision. The record reveals that Ms. Morse's complaints are supported by medical evidence and the ALJ's decision contains no indication of why her complaints were discredited. Hence, we find that the ALJ improperly discredited Ms. Morse's complaints of pain and should have included all of them in the hypothetical questions posed to the vocational expert.

### B. Dr. Davis's Credibility

■ The ALJ rejects Dr. Davis's findings regarding the degree of Ms. Morse's impairments based in part on the ALJ's finding that Dr. Davis is not qualified to say whether the claimant is disabled under the Social Security Act (the "Act"). The ALJ asserts that Dr. Davis is not familiar with the Act and regulations and that it is exclusively the ALJ's prerogative to find that she is or is not disabled. While it is true that the ALJ applies the Act and regulations to determine if a claimant is considered disabled under the Act, the ALJ may not simply disregard a credible medical opinion in making this determination.

■ Initially, the ALJ's observations are not grounds for rejecting the findings of a board certified internist. The treating physician has the best opportunity to observe and evaluate a claimant's condition. This court has on repeated occasions emphasized that the treating physician's evidence must be given great weight, with deference to the physician's findings over an examining physician or consultant. *See Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir.1992); *Henderson v. Sullivan,* 930 F.2d 19, 21 (8th Cir.1991); *Hancock v. Secretary of the Dep't of Health, Educ. and Welfare,* 603 F.2d 739, 740 (8th Cir.1979) ("[T]he report of a consulting physician who examined the claimant once does not constitute 'substantial evi-

dence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." (citations omitted)); *Veal v. Califano*, 610 F.2d 495, 497–98 (8th Cir.1979) (written report of non-examining physicians entitled to little weight in overall evaluation of disability); *Landess v. Weinberger*, 490 F.2d 1187, 1189–90 (8th Cir.1974).

■ The fact that a physician is not trained in the statutes and regulations of the Social Security Act does not preclude the physician from evaluating the claimant. The physician's findings and conclusions constitute substantial evidence which must be carefully weighed by the ALJ and the Secretary. Unless there is medical evidence that contradicts or refutes the physician's medical conclusion, the Secretary is *bound* to treat the treating physician's diagnosis and conclusion as substantial evidence.[4] *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978); *see also Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982) ("If the ALJ concludes that a treating physician's evidence is credible, therefore, he should give it controlling weight in the absence of evidence to the contrary because of the treating physician's greater familiarity with the plaintiff's conditions and circumstances." (citations omitted)).

There is no medical evidence to contradict Dr. Davis's findings and no evidence indicating that Dr. Davis is not credible. The ALJ apparently thought that two statements made by Dr. McKay were inconsistent with Dr. Davis's diagnosis. On March 29, 1990, Dr. McKay wrote that Ms. Morse is "somewhat limited" by her cardiac disease and low back pain and is "somewhat disabled." On December 14, 1990, Dr. McKay opined that Ms. Morse has significant cardiac disease which was stable and mildly limiting at that time, that her pulmonary disease was not limiting, and that Ms. Morse's back and leg pain seem to be the most limiting of her problems. It is important to note that Dr. McKay is a member of the Cardiovascular

Diseases Division at UIH, and that his area of specialization does not encompass pulmonary disease or problems associated with the back or legs.

It was for Dr. Davis, Ms. Morse's treating physician, to consider Dr. McKay's cardiac evaluations in conjunction with Ms. Morse's other impairments. Thus, even if Dr. McKay states that Ms. Morse is "mildly disabled," this does not contradict Dr. Davis's finding of more severe impairment which is based upon his consideration of the combined effect of all of the claimant's impairments. *See* 42 U.S.C. § 1382c(a)(3)(F); *Delrosa v. Sullivan*, 922 F.2d 480, 484 (8th Cir.1991) (ALJ is required to consider the combined effects of claimant's impairments); *see generally Donato v. Secretary of the Dep't of Health and Human Servs.*, 721 F.2d 414, 419–20 (2d Cir.1983) (although findings of non-treating physicians were somewhat inconsistent with treating physician's, they were "not so completely at odds with his diagnosis" particularly where all parties agreed that claimant suffered from serious impairments).

■ In contrast to Dr. Davis, the ALJ is not a medical expert and cannot by his legal expertise discount and reject the medical findings and conclusions of the physician. His role is not to make a personal estimate of the claimant's impairments but to base his findings on whether the credible evidence before him sustains or does not sustain the claimant's asserted disability. In this case, the ALJ has made medical and psychological conclusions without substantial evidence to support his findings.

### C. Ms. Morse's Daily Living Routine

The ALJ also discounts Dr. Davis's conclusion of disability because he finds Ms. Morse's daily living routine to be inconsistent with disability. The ALJ recites that the claimant gets up in the morning and is awake during regular hours, she does the dishes and laundry and is able to read, when her

---

4. This approach is consistent with Social Security Regulations that grant controlling weight to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case. *See* 20 C.F.R. § 416.927(d)(2) (1993) (effective Aug. 1, 1991); *Nelson v. Sullivan*, 966 F.2d 363, 367–68 (8th Cir.1992) (recognizing that "the new regulation merely codifies this circuit's law regarding the opinions of treating physicians").

daughter visits she helps her daughter *watch* her two small grandchildren, she has dinner at home or her daughter's, she attends church, she does light cleaning once a week, she cooks three to four times a week and shops once a month.

 These minimal activities do not refute the fact that the claimant cannot perform substantial gainful activity. Disability under the Social Security Act does not mean total disability or exclusion from all forms of human and social activity. *See Harris v. Secretary of the Dep't of Health and Human Servs.*, 959 F.2d 723, 726 (8th Cir.1992) (claimant's ability to cook, shop, clean, do laundry and visit friend does not constitute substantial evidence that claimant can engage in substantial gainful activity); *Thomas*, 876 F.2d at 669 ("[A] claimant need not prove she is bedridden or completely helpless to be found disabled."); *Jeffcoat v. Bowen*, 840 F.2d 592, 596 (8th Cir.1988).

### D. Ms. Morse's Work History

The ALJ cites the claimant's limited work history, reasoning that such a limited history does not operate in favor of the claimant's attempt to establish disability impairment. The claimant's medical history demonstrates that she has not been the best candidate for continued employment. The fact that she has not worked most of her adult life does not prove or disprove her present status of disability under the Act. It certainly does not serve as evidence to refute Dr. Davis's diagnosis.

### E. Jobs in the National Economy

Not only does Dr. Davis's diagnosis stand uncontradicted, but the Secretary has not shown that a significant number of jobs exist in the national economy which Ms. Morse is able to perform. The ALJ relies on the opinion of a vocational expert who testified that Ms. Morse could perform sedentary unskilled positions and that there were 5,000 positions of sedentary work in Iowa (250,000 positions in the United States) which the claimant could perform. When informed that the claimant could not stoop, bend repetitively, climb, kneel or crawl, must alternate sitting with standing with no more than for-ty-five minutes in one position, and could do only simple repetitive tasks, the vocational expert altered his opinion and said there were only 500 positions in Iowa (25,000 in the United States).

 In order to rely on a vocational expert's opinion, "the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments." *Totz v. Sullivan*, 961 F.2d 727, 730 (8th Cir.1992) (citing *Shelltrack v. Sullivan*, 938 F.2d 894, 898 (8th Cir.1991)). If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *See id.; Greene v. Sullivan*, 923 F.2d 99, 101 (8th Cir.1991).

 The hypothetical posed to the vocational expert in this case is inadequate for a number of reasons and as a result the vocational expert's opinion cannot serve as a basis for denying benefits to Ms. Morse. One of the most disturbing aspects of the hypothetical is the use of a stress test. In posing the hypothetical, the ALJ asked the vocational expert to assume that the claimant could handle a stress level of six on a scale of one to ten. There is no psychological test in evidence to support such an assumption. The ALJ admittedly created this test from his own determination of what stress levels certain jobs might involve and picked the score of six as the amount of stress that the claimant could endure. There is no medical evidence to support the ALJ's assumptions, and a hypothetical question based solely upon the ALJ's assumptions, without medical corroboration, is devoid of usefulness or meaning. *See Mitchell v. Sullivan*, 925 F.2d 247, 249–50 (8th Cir.1991) (rejecting the ALJ's assignation of a stress level of five on a one to ten scale because there was no medical corroboration that claimant could withstand a moderate level of stress); *Douglas v. Bowen*, 836 F.2d 392, 396 (8th Cir. 1987). More importantly, Dr. Davis's opinion reflects that the claimant is unable to handle the stress which results from exertion: she becomes very depressed, cannot sleep and

cries. *See Delrosa,* 922 F.2d at 484 (improper for ALJ to substitute his "own unsubstantiated conclusions" regarding claimant's medical condition for that of the treating physician).

The hypothetical was also deficient because it failed to disclose that this claimant has for the past several years, and particularly since September of 1989, been under constant medical care for her back, her heart, her depression and her pulmonary problems. No employer would consider her employable. *See Douglas v. Bowen,* 836 F.2d 392, 396 (8th Cir.1987) (vocational expert acknowledged that claimant could not find work in the national economy if he had more than two absences a month due to his impairments); *Dobrowolsky v. Califano,* 606 F.2d 403, 408 & n. 16 (3d Cir.1979) (noting that most jobs require regular attendance).

The hypothetical question completely ignored the claimant's unrefuted testimony that her daily activities were extremely limited. She testified she could not sit for more than two or three minutes at a time depending on the type of chair. She could stand for only five to ten minutes. She slept only two to four hours a night, sometimes waking every hour. She was under constant medication. She took Lasix, Lanoxin, Coumadin, Potassium, used an inhaler and carried nitroglycerin at all times. She had to lay down throughout the day. It is unrealistic to think that a person with such medical conditions and limitations of motion and exertion could perform substantial gainful activity even on a part-time basis. *See Mitchell v. Sullivan,* 925 F.2d 247 (8th Cir.1991) (claimant found disabled where he could not perform jobs requiring physical or mental stress and jobs identified by vocational expert had near moderate degree of stress associated with them); *Ferguson v. Schweiker,* 765 F.2d 31, 36 (3d Cir.1985); *Delgado v. Heckler,* 722 F.2d 570, 574 (9th Cir.1983) ("A man who cannot walk, stand or sit for over one hour without pain does not have the capacity to do most jobs available in the national economy.").

Finally, in determining that a significant number of jobs exist which Ms. Morse could perform, the vocational expert found that Ms. Morse had no transferable skills and opined that she could perform work only at an unskilled level, including the "unskilled clerk positions of reviewer, sorter and checker." The Secretary now concedes on this appeal that the Dictionary of Occupational Titles (4th ed. 1991) lists these jobs at a skill level higher than that of unskilled. The Secretary urges that the issue of skill level was not raised at the district court level. The court is free, however, to take judicial notice of the Secretary's own rules and regulations. *See Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 742 n. 4, 96 S.Ct. 2337, 2343 n. 4, 49 L.Ed.2d 179 (1976); *Ray v. Aztec Well Svc. Co.,* 748 F.2d 888, 889 (10th Cir.1984); *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Zantop Air Transport Corp.,* 394 F.2d 36, 40 (6th Cir. 1968). Without deciding whether 500 jobs in the state of Iowa is sufficient, we simply point up the shortcoming of the vocational expert in stating that these jobs are available for unskilled labor and including them in the jobs which Ms. Morse allegedly could perform.

We find the ALJ's hypothetical question not only misleading as to the claimant's ability to handle stress and her need for constant medical care, but the vocational expert's response relating to unskilled jobs must be discounted in weighing the overall record for substantial evidence. Because the hypothetical question did not adequately present the full extent of Ms. Morse's impairments and in light of the vocational expert's failure to properly identify jobs which Ms. Morse may be capable of performing, the vocational expert's opinion cannot constitute substantial evidence to support a conclusion of no disability.

### III.

We find that substantial evidence on the record as a whole does not support the Secretary's determination that the claimant retained sufficient residual functional capacity to perform substantial gainful activity. The medical opinion and the overall record clearly support a finding of disability under the Act and, in light of the flawed hypothetical, the Secretary has not shown that jobs exist in

the national economy which the claimant could perform.

The judgment of the district court is reversed. The case is remanded to the Secretary with directions to grant supplemental social security income to the claimant.

MAGILL, Circuit Judge, dissenting.

I dissent. The majority has reversed the district court based upon a physician's legal opinion and, in the process, mischaracterizes the use of medical-opinion evidence. Basing its reversal largely on the conclusory statement of a physician, the majority also exceeds its permissible scope of review in finding that the hypothetical posed to the vocational expert was unsupported by substantial evidence in the record.

## I. Medical–Opinion Evidence

The majority misconstrues both the proper scope and the proper application of medical-opinion evidence. Medical opinions are relevant evidence to a determination of a claimant's impairments; medical opinions are not conclusive evidence of whether a claimant can perform substantial gainful work. *Nelson v. Sullivan*, 946 F.2d 1314, 1316–17 (8th Cir.1991). The majority's assertion regarding Dr. Davis's statement, *ante*, at 871 ("the Secretary presented no evidence that contradicts Dr. Davis's opinion regarding the claimant's disability"), incorrectly frames the disability analysis. An ALJ need not contradict a treating physician's statement to find a claimant to be not disabled. *Cf.* 20 C.F.R. § 416.927(d)(3) (1993) ("The better an explanation a treating source gives for an opinion, the more weight we will give that opinion.").

Dr. Davis's statement that Ms. Morse is disabled, however, is not a medical opinion.[1] Regardless of the label, a physician's statement on the ultimate issue of disability is not binding on the Secretary. 20 C.F.R. § 416.-927(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *accord Janka v. Secretary of Health, Educ., & Welfare*, 589 F.2d

365, 369 (8th Cir.1978). Under the Social Security Act, a treating physician's *medical opinions* are given great weight. 20 C.F.R. § 416.927(d)(2); *see also Nelson v. Sullivan*, 966 F.2d 363, 367 (8th Cir.1992) (20 C.F.R. § 416.927 is a codification of the Eighth Circuit's treating-physician rule). "Medical opinions are statements from physicians ... that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairments, and [the claimant's] physical or mental limitations." 20 C.F.R. § 416.927(a)(2). When a physician renders an evaluation of a claimant's ability either to do prior work or to perform other positions based upon her physical or mental impairments, that evidence should be carefully considered by the Secretary. *See Turpin v. Bowen*, 813 F.2d 165, 172 (8th Cir.1987). However, the Secretary need not give great or controlling weight to the conclusions of a medical physician regarding a claimant's ability to do work if that conclusion is not supported by evidence in the record or is merely conclusory. 20 C.F.R. § 416.927(d)(2); *accord Janka*, 589 F.2d at 369 (medical opinion unsupported by the record); *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir.1986) (treating physician's statements were conclusory).

Dr. Davis's "findings" to which the majority refers are neither medical findings, nor medical conclusions. Dr. Davis made a broad conclusory statement that Ms. Morse "is disabled as far as regular work is concerned." App. at 990. This statement is a legal conclusion. *See* 20 C.F.R. § 416.-927(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."). Moreover, specifically how this conclusion affects the fifth step of the sequential analysis is a quandary. The record does not indicate that Dr. Davis's statement that Ms. Morse is disabled was based on an opinion that Ms. Morse could not perform any substantial gainful work existing in significant

---

1. When Dr. Davis states that Ms. Morse must avoid fumes, that is a medical opinion. When Dr. Davis states that Ms. Morse must avoid lifting more than 20 pounds, that is a medical opinion. A statement that an individual is disabled under the Social Security Act is a legal conclusion.

numbers in the national economy; nor does the majority make such an assertion.

## II. The Fifth Step of the Sequential Analysis

The majority states that "[i]n formulating the hypotheticals and reaching the conclusion that Ms. Morse is not disabled, the ALJ discredited Dr. Davis's findings." *Ante*, at 871; *see also id.* at 872 ("The ALJ rejects Dr. Davis's findings regarding the degree of Ms. Morse's impairments."). The ALJ did not discredit Dr. Davis's findings regarding the degree of Ms. Morse's impairments. In fact, the limitations articulated by Dr. Davis [2] are essentially the same limitations underlying the vocational expert's conclusion that the hypothetical individual could perform substantial gainful work existing in the national economy.[3] The ALJ properly rejected Dr. Davis's final conclusion that Ms. Morse was disabled because this conclusion was unsupported by the evidence and not based upon a finding that Ms. Morse could not do any substantial gainful activity existing in significant numbers in the national economy.

The majority finds that the ALJ erred when he discredited Ms. Morse's subjective complaints of pain. I disagree. The record amply supports the ALJ's finding. The ALJ notes that he considered all the *Polaski* factors,[4] and an examination of the ALJ's decision supports his statement. The majority's digression regarding Ms. Morse's work history and daily living routine begs the question of whether the vocational expert's testimony was supported by substantial evidence. I fail to perceive any association between these issues and the validity of the vocational expert's hypothetical.

The only substantive issues raised by the majority regarding the hypothetical posed to the vocational expert are refuted by the record. The majority states "[t]here is no psychological test in evidence to support" the ALJ's stress level of six on a scale of one to ten. *Ante*, at 874. There is, however, a psychological assessment to support the ALJ's stress level determination. Ms. Morse was evaluated by a clinical psychologist who opined that her "[w]ork related activities [are] *somewhat* restricted by stress." App. at 995 (emphasis added).[5] A stress level of

**2.** In relevant part, Dr. Davis's letter reads:

> I believe Mrs. Morse is disabled as far as regular work is concerned. She would be restricted from lifting more than perhaps 20 pounds and would be unable to carry even smaller amounts more than a few feet at a time. She does not appear to be restricted as far as standing, moving about and sitting but would be limited as far as walking because of her mitral valvular disease and her congestive heart failure. She would have considerably limited stooping, climbing, kneeling and crawling and could not be expected to do this in a job situation because of her lumbar disc disease which causes continuous pain even when she is resting.
> I do not believe that Mrs. Morse has difficulty with handling objects, seeing, hearing, speaking, or traveling. She could not be exposed to environments involving fumes, high or low temperatures or hazards such as climbing or being in high places because of her heart disease.

App. at 990.

**3.** The initial hypothetical included the following limitations: a maximum weight limit of 20 pounds; standing, walking or climbing no more than occasionally; no repetitive pushing or pulling; no arm work above shoulder level; no prolonged work in extremes of temperature, fumes, or high humidity; no work around unprotected

heights or dangerous moving machinery; no work in an environment with a stress level over six on a scale of one to ten; only occasional contact with the public; no work requiring close attention to detail; and no very complex or technical work. App. at 87–88.

In the second hypothetical, the ALJ asked the vocational expert to assume the following limitations in addition to those previously enumerated: no repetitive bending; no stooping, climbing, kneeling or crawling; and alternating positions between standing and sitting at least every 45 minutes. App. at 89.

**4.** *See Polaski v. Heckler*, 739 F.2d 1320, 1322, *supplemented*, 751 F.2d 943 (8th Cir.1984), *vacated*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand*, 804 F.2d 456 (8th Cir.1986), *cert. denied*, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987).

**5.** On September 19, 1990, Robert L. Notch, Ph. D., opined the following:

> Claimant has a chronic depression and personality disorder by history. She has been restricted to sedentary work physically. Depression appears reactive to physical problems. ADL's [activities of daily living] not significantly restricted by mental problems. Work related activities somewhat restricted by stress, though most restriction appears physical.

six on a scale of one to ten appears to fairly represent, if not overly represent in Ms. Morse's favor, the psychologist's assessment.

The majority finds further error in the ALJ's decision because the ALJ discredited portions of Ms. Morse's testimony and didn't include Ms. Morse's "constant medical care," *ante*, at 875, in the hypothetical. Regarding the first finding, the majority overlooks that as the trier of fact, the ALJ makes the credibility assessments, not the courts. *Richardson v. Perales*, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1970). As to frequent medical care, the majority points to no evidence in the record to establish that Ms. Morse's medical care will make her miss work on a regular basis, and, instead, the majority assumes that frequent medical care is synonymous with frequent work absences. *See ante*, at 875–76.[6]

I dissent because the majority has effectively nullified the Secretary's regulation, 20 C.F.R. § 416.927, and this circuit's precedents defining the scope and application of medical-opinion evidence. Furthermore, I am bound by the limitations accorded by Congress when reviewing this record, *see* 42 U.S.C. § 405(g) (1988), and find that substantial evidence in the record supports the decision of the Secretary.

### ORDER

April 5, 1994.

On the court's own motion petition for rehearing by the court en banc is granted. The opinion and judgment of this court entered on March 3, 1994, are vacated.

The argument date will be fixed by a later order of this court.

---

From a psychiatric standpoint no significant new evidence is noted that would change this review from earlier reviews. Simple routine work.

App. at 995.

**6.** The majority identifies another purported problem with the fifth step in the disability analysis:

the categorization of the reviewer, sorter, and checker positions as unskilled sedentary clerical positions. The majority has not suggested, nor does the record indicate, that Ms. Morse could not perform these positions. Hence, I cannot perceive how a change in the Dictionary of Occupational Titles category affects the validity of the Secretary's decision.