Paul Blake v. SSA                    CV-99-126-B    01/28/00

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Paul F. Blake**

   **v.**                                  Civil No. 99-126-B
                                       Opinion No. 2000 DNH 029

**Kenneth S. Apfel, Commissioner,**
**Social Security Administration**



## MEMORANDUM AND ORDER

On October 15, 1993, Paul F. Blake ("Blake) filed an application for disability insurance benefits under Title II of the Social Security Act.  After having his application denied both at the administrative level and by an administrative law judge, Blake sought judicial review of the Commissioner's final decision denying his application for benefits.  On May 22, 1997, the district court remanded the matter for further proceedings. On remand, the administrative law judge again denied Blake's application for benefits.  In the present action, Blake, pursuant to 42 U.S.C. § 405(g) (1994), seeks judicial review of the Commissioner's second decision to deny his application.  For the

reasons set forth below, I conclude that the Commissioner's decision is not supported by substantial evidence. As result, I grant Blake's motion to reverse and remand the Commissioner's decision.

## I.   BACKGROUND[1]

### A.   Procedural History

Blake filed his current application for Disability Insurance Benefits ("DIB") on October 15, 1993. He alleged disability since November 30, 1987 due to a herniated disc, degenerative joint disease, and sciatic pain radiating from his hip to toe, bilaterally.

After his application was denied both initially and upon reconsideration, Blake requested a hearing before an Administrative Law Judge ("ALJ"). On February 16, 1995, ALJ Klingebiel held a hearing at which Blake and his wife testified. ALJ Klingebiel found Blake not disabled. The Appeals Council

---

[1]   Unless otherwise noted, the following facts are taken from the parties' Joint Statement of Material Facts (doc. no. 8).

denied Blake's request for review.  Blake sought judicial review and on May 22, 1997 the district court granted the Commissioner's assented-to motion for an order reversing and remanding the matter for further proceedings.  The Appeals Council remanded the matter to the ALJ with direction to evaluate more thoroughly Blake's complaints of pain and determine the weight to be assigned to the opinion of Blake's treating physician, Dr. Brassard, as outlined in his June 1, 1995 letter.

On April 16, 1998, ALJ Klingebiel held a second hearing at which Blake, his wife, and a vocational expert testified.  In his order dated July 2, 1998,  ALJ Klingebiel determined that Blake had the residual functional capacity ("RFC") to perform a limited range of light work.  Based upon the testimony of the vocational expert, the ALJ concluded that Blake could not return to his prior work but that there were a significant number of jobs in the national economy Blake could perform.  Accordingly, ALJ Klingebiel found Blake not disabled through June 30, 1993, the date he last met the insured status requirements of the Social

Security Act.  The Appeals Council denied Blake's request for review on February 8, 1999, thereby rending ALJ Klingebiel's July 2, 1998 order the final decision of the Commissioner.

## B.  Medical Evidence

Blake was born January 3, 1948.  As of the date he last met the insured status requirements, he was 45 years old.  Blake has a tenth grade education and his past relevant work includes work as a laborer, plastic injection mold machine operator and maintenance man, and finishing room worker.

In 1987, Blake, while putting up a chimney at his house, injured his back when he twisted to put down a cement block he had carried up a ladder.  Shortly thereafter, Blake sought treatment from Dr. Brassard, a general practitioner, who gave him a shot which provided temporary local relief.  Blake tried to return to work but stopped due to steady pain in his lower back.

On December 21, 1987, Dr. Kathleen Robinson ordered x-rays of Blake's lumbar spine.  These x-rays showed only a minimal narrowing of the L5-S1 intervertebral disc, which might have been

a normal variant or due to minimal degenerative disc disease. The x-rays also showed minimal anterior bony outgrowths on L3 through S1. A spinal CT scan performed on January 12, 1988 showed degenerative disc disease at S1, but that the other levels were normal. No true disc herniation was identified.

In July 1988, Dr. Ramos, a physiatrist, examined Blake. On neurological evaluation, Blake reported decreased sensory appreciation over the left L4-5 dermatome level in response to light touch, deep touch, vibratory, and pinprick stimuli. Upper deep tendon reflexes were normal, but lower extremity reflexes were hypoactive. Muscle strength in the upper and lower extremities was normal, but trunk mobility was markedly restricted, secondary to complaints of acute pain and tightness. Detailed palpation over the lumbar paraspinous muscles and the gluteal region elicited acute spasms, tenderness, and complaints of impaired sensation extending into the left leg. Deep constant pressure over the left sciatic notch elicited marked discomfort. Dr. Ramos diagnosed acute bilateral sacrospinalis and left

quadrant lumbar muscle inflamation. Dr. Ramos also wanted to rule out the possibility of left L4-5, S1 radiculopathy. See Tr. at 186. He recommend localized nerve block, anti-inflammatory medication, and conservative physical rehabilitation treatment. In August 1988, an EMG was performed which showed evidence of chronic nerve root irritation at the left L5-S1 level.

From July 22, 1988 to October 7, 1988, Blake attended physical therapy. By October, there were minimal findings and Blake's muscles were described as minimally tender. During the fall of 1988, Blake also had been building his endurance by walking on a daily basis.

In December 1988, Blake saw Dr. Porter, an orthopedic surgeon, because of his complaints of persistent thoracic and lower back pain. Dr. Porter observed that Blake had decreased flexion, extension, and lateral flexion in his lower back and some subjective sensory loss in the lateral aspect of his left foot. Blake's reflexes were equal and normal.

At Dr. Porter's recommendation, Blake underwent a MRI

(magnetic resonance imaging) of his back in January 1989.  The MRI showed a herniated disc at L5-S1, more to the left than to the right, which Dr. Porter noted could have caused the pain down Blake's left leg and some numbness in the left foot.  The herniation indented the epidural fat but there was no distortion of the thecal sac.  Dr. Porter noted that there was no imminent nerve loss and that surgery would be indicated if pain returned as Blake increased his activities.

In December 1989, Dr. Brassard diagnosed a herniated lumbar disc, degenerative arthritis, and obesity.  He prescribed several medications including Motrin and Darvocet.  Dr. Brassard's March 1991 treatment notes indicated Blake still reported subjective complaints of pain with respect to his lower back, left chest radiating into his neck, and right leg.  On January 16, 1992, Dr. Brassard reduced Blake's Motrin dose because he had developed gastritis due to Motrin overuse.  At the end of the month, Dr. Brassard prescribed phenobarbital but Blake stopped taking it in February because it made him "ugly."

On February 21, 1992, Dr. Martino conducted a neurological evaluation of Blake. Dr. Martino found that Blake had 4/5 strength in his lower extremities with give away weakness and discomfort, while his upper extremities were unimpaired. There was decreased pin prick sensation in a circumferential fashion in his entire left leg and in a patchy fashion in his right leg not corresponding to any singular nerve or dermatome. Blake's gait was significant for left-sided limb favoring. It was Dr. Martino's impression that Blake had protracted lumbar radiculopathy and recommended a right S1 nerve root block.

Dr. Porter again examined Blake in January 1994. Dr. Porter found that Blake's gait was reasonably normal, but slow; straight leg raising was negative to 80 degrees; motor strength was normal; and sensation seemed intact. See id. at 183. Dr. Porter diagnosed chronic low back pain secondary to degenerative disc disease without any evidence of nerve root impingement or foraminal encroachment. Dr. Porter opined that there was no indication that surgery would be beneficial in Blake's case. See

id.

In his June 1, 1995 letter, Dr. Brassard opined that throughout the time he treated Blake, Blake experienced chronic pain which would be expected to limit his capacity to attend regularly and consistency to any occupation or activity.


## II.  STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, I am authorized to: 1) review the pleadings submitted by the parties and the transcript of the administrative record; and 2) enter judgment affirming, modifying, or reversing the Commissioner's decision.  See 42 U.S.C. § 405(g) (1994).  My review is limited in scope, however, as the Commissioner's factual findings are conclusive if they are supported by substantial evidence.  See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)(per curiam); 42 U.S.C. § 405(g).  The Commissioner is responsible for settling

credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" Id. (quoting Rodriquez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (alteration in original).

If the ALJ has misapplied the law or has failed to provide a fair hearing, deference to the ALJ's decision is not appropriate; remand for further development of the record may be necessary. See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987)(per curiam) ("The [ALJ's] conclusions of law are reviewable by this court."). I apply these standards in reviewing the issues Blake raises on appeal.

## III.  **DISCUSSION**

An ALJ is required to apply a five-step sequential analysis to determine whether a claimant is disabled within the meaning of the Act.[2]  At step four, the ALJ must determine whether the claimant's impairment prevents him from performing his past work. See 20 C.F.R. § 404.1520(e) (1999).  The ALJ must assess both the claimant's residual functional capacity ("RFC"), that is, what the claimant can do despite his impairments, and the claimant's past work experience.  See Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991)(per curiam).  At step five, the burden shifts to the Commissioner to show that there

---

[2]     In applying this five-step sequential analysis, the ALJ is required to determine:
    (1)   whether the claimant is presently engaged in substantial gainful activity;
    (2)   whether the claimant has a severe impairment that lasted for twelve months or had a severe impairment for a period of twelve months in the past;
    (3)   whether the impairment meets or equals a listed impairment;
    (4)   whether the impairment prevents or prevented the claimant from performing past relevant work;
    (5)   whether the impairment prevents or prevented the claimant from doing any other work.
See 20 C.F.R. § 404.1520 (1999).

"are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Secretary of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988)(per curiam). The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

In the present case, the ALJ found Blake not disabled at step five. The ALJ determined that Blake has the residual functional capacity to perform a limited range of light work. Based upon the testimony of a vocational expert, the ALJ determined that Blake cannot return to his past work but that there are jobs in the national and local economy which Blake is capable of performing.

Blake makes three principal arguments in support of his motion to reverse the ALJ's decision. First, Blake argues that

the ALJ erred by not giving controlling weight to the opinion expressed by his treating physician, Dr. Brassard, in his June 1, 1995 letter. Second, Blake asserts that the ALJ was not entitled to rely upon the testimony of the vocational expert because the hypothetical posed to the VE did not reflect Blake's functional limitations as outlined by Dr. Brassard in his June 1, 1995 letter. Third, Blake argues that the ALJ improperly assessed his subjective complaints of pain. I agree that the ALJ did not perform a proper analysis of Blake's pain complaints. As a result, I address only this error and express no opinion on the remaining issues raised by Blake's motion.[3]

---

[3] The ALJ addressed the issue of whether Dr. Brassard's June 1, 1995 assessment of Blake's functional limitations was entitled to controlling weight in his discussion of Blake's credibility. The ALJ discounted Dr. Brassard's opinion because it was not sufficiently supported by objective medical evidence and relied too heavily upon Blake's subjective complaints of pain. See Tr. at 248 (discounting Dr. Brassard's opinion because of Dr. Brassard's "apparent disproportional reliance on the claimant's own subjective complaints relative to the paucity of objective medical evidence throughout the record"). Although I find that the ALJ must reassess Blake's credibility, I express no opinion on whether, after such reassessment, the ALJ still may discount Dr. Brassard's opinion.

## A. Standards Governing ALJ's Pain Determination

The regulations require that a claimant's symptoms, such as pain, be considered when determining whether a claimant is disabled. A two-step process is used to evaluate a claimant's subjective complaints of pain. First, the claimant must suffer from a medically determinable impairment which can reasonably be expected to produce the pain alleged. See 20 C.F.R. 404. § 1529(b) (1999); see also Da Rosa v. Secretary of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986)(per curiam). Second, if this showing is made, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [his or her] capacity for work." 20 C.F.R. § 404.1529(c)(1). At this step, the ALJ considers "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." Id.

A claimant's subjective complaints of pain will be deemed credible only if they are consistent with the objective medical evidence and the other evidence in the record. See id. §1529(a).

Although objective medical evidence is important, it does not have to corroborate precisely the claimant's pain complaints; rather, it only needs to be consistent with the claimant's complaints. See Dupuis v. Secretary of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989)(per curiam). As a result, an ALJ must not overemphasize the importance of objective medical findings when assessing the credibility of the claimant's complaints regarding the intensity and persistence of his pain. An ALJ must not disregard a claimant's complaints "solely because they are not substantiated by objective medical evidence." Social Security Ruling 96-7p, 1996 WL 374186, at *6 (Jul. 2, 1996) [hereinafter SSR 96-7p] (noting that objective medical evidence is just one factor to be considered in assessing credibility); see also Hatfield v. Apfel, No. Civ. A. 94-1295-

JTM, 1998 WL 160995, at *7 (D. Kan. Mar. 3, 1998) ("[T]he claimant need not produce objective medical evidence of the level and persistence of her pain.").

Because the regulations recognize that symptoms, such as pain, may suggest a more severe impairment "than can be shown by objective medical evidence,"[4] 20 C.F.R. § 404.1529(c)(3), they direct the ALJ to consider several factors relevant to a claimant's complaints of pain. These factors include: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his pain; 5) treatment, other than medication, the claimant receives or has received for relief of his pain; 6) any measures the claimant uses or has used to relieve pain; and 7)

---

[4] While symptoms cannot be objectively measured, their effects often can be clinically observed. For example, findings of reduced joint motion, muscle spasm, sensory deficit, or motor disruption may be the product of, or associated with, symptoms of pain. SSR 96-7p, 1996 WL 374186, at *6.

-16-

any other factors concerning the claimant's limitations and restrictions due to pain.  Id.; Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  In addition to considering these factors, the ALJ is entitled to observe the claimant, evaluate his demeanor, and consider how the claimant's testimony fits with the rest of the evidence.  See Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)(per curiam) (holding that ALJ's credibility finding is entitled to deference, especially when it is supported by specific findings).

## B.  ALJ's Assessment of Blake's Subjective Complaints of Pain

In the present case, the ALJ determined that the objective medical evidence revealed an underlying disc pathology which reasonably could be expected to produce Blake's pain complaints. See Tr. at 249.  Because the ALJ did not credit Blake's complaints regarding the severity of his pain, he concluded that Blake's lower back and leg symptoms do not further erode his

-17-

ability to perform the range of light work the ALJ had defined.[5]
See id. ("[A]lthough I do not question that the claimant
experienced chronic pain throughout his period of treatment with
Dr. Brassard, the lack of objective medical measures and regular
treatment undermine the conclusion that the claimant was unable
to perform the range of light work enumerated above."). In
particular, the ALJ determined that Blake's subjective complaints
of pain were not credible in light of (1) discrepancies between
Blake's assertions and the objective medical findings; (2) the
frequency and degree of medical treatment Blake required; and
(3) Blake's daily activities.[6] I find that the ALJ's adverse

_____

[5] The ALJ determined that Blake has the residual functional
capacity to perform a limited range of light work. According to
the ALJ, Blake is incapable of performing the full range of light
work because he cannot bend repeatedly and must have an
opportunity to change position as needed. See Tr. at 247. In
his enumerated findings, the ALJ stated a similar conclusion.
See id. at 251 finding #5 (identifying inability to walk
repetitively as another functional limitation).

[6] The ALJ offered the following explanation in support of
his adverse credibility determination:
        While I am mindful of the claimant's
        difficulties maintaining insurance, I should

credibility determination was improper because it overstated the importance of corroborating objective medical evidence and misconstrued and/or ignored non-medical evidence supporting Blake's subjective complaints of pain.

1. Objective Medical Evidence

The ALJ discredited Blake's subjective complaints at the second step of the pain analysis. At that point, the ALJ was

> once again also note that the claimant's limited use of medication and other treatment modalities runs counter to Dr. Brassard's general comments with regard to the severity of the claimant's pain. If in fact the claimant's pain were intolerable, it is reasonable to expect to see recurrent emergency room visits, or at least more frequent and involved discussion of pain management in treatment notes. Yet, more often than not, Dr. Brassard's treatment notes contain no mention whatsoever of strategies to address the claimant's pain. . . . More generally, I must point to the claimant's good response to even a short period of physical therapy in July 1988 (Exhibit B21), I should also mention the claimant's self-reports that he would walk almost every day and could walk up to one mile (Exhibit B13). He also reportedly took care of some household tasks (Exhibit B8).

Tr. at 248-49.

-19-

entitled to consider the objective medical evidence but he was not entitled to reject Blake's complaints about the severity of his pain simply because they were not substantiated by objective medical evidence. The ALJ erred by attaching too much weight to the absence of objective medical findings.

The MRI and other x-rays of Blake's back did not reveal any "nerve root impingement or loss of function," id. at 172, or other abnormalities, see id. at 174. Nonetheless, the medical evidence included several references to Blake's complaints of pain and doctors' observations of his pain. See, e.g., id. at 167 (Dr. Porter's December 22, 1988 out-patient visit notes observing that Blake appeared to be in "chronic distress"). Although Dr. Porter indicated that he found it difficult to "sort out the complaints with objective evidence of any positive findings," he indicated that he believed Blake's pain complaints were genuine. Id.

In addition, the ALJ failed to consider in his analysis of Blake's credibility clinical findings measuring the effects of

Blake's pain symptoms.  For example, he made no mention of Dr.

Ramos' findings that Blake experienced  "acute spasms,"

tenderness, and tightness in certain areas.  See id. at 186.  Nor

is it apparent that the ALJ accounted for Dr. Porter's 1988

observation of Blake's decreased motion in his back, "to

flexion/extension and lateral flexion," id. at 167, or Dr.

Martino's 1992 finding that Blake showed "4/5 power in the lower

extremities with give away weakness and discomfort," id. at 175.[7]

Closely related to the ALJ's concern about the lack of

objective medical finding, was his concern about Blake's failure

to seek more frequent treatment for his pain.  According to the

ALJ, the absence of regular treatment suggested that Blake's pain

was not as severe as he alleged.

An ALJ is entitled to treat frequency of treatment as a

factor in his credibility determination.  See Irlanda Ortiz, 955

F.2d at 766 ("The ALJ also relied on the fact that for long

---

[7]  In his recitation of the medical evidence, the ALJ
mentioned these findings of Dr. Ramos and Dr. Martino, but not
those of Dr. Porter.  See Tr. at 244-47.

periods of time claimant was not in any treatment for his back problems. The ALJ inferred that had claimant's pain been as severe as alleged, claimant would have sought treatment."). An inconsistency between the frequency of treatment and the severity of pain alleged generally erodes the credibility of a claimant's complaints of pain. See SSR 96-7p, 1996 WL 374186, at *7. An ALJ, however, may draw a negative inference only after he first considers evidence explaining a claimant's "infrequent or irregular medical visits or failure to seek medical treatment." Id. at *7-8 (citing inability to afford treatment as example of an explanation for claimant's failure to seek treatment). Consideration of such explanations is necessary to gain insight into a claimant's credibility. See id. at *7.

In the present case, the ALJ inadequately discharged his obligation to consider Blake's explanation for failing to seek more regular medical treatment before drawing a negative credibility inference from this evidence. Blake claimed that financial hardship – arising out of his inability to work, his

loss of health insurance, his wife's inability to get health insurance through her employers, and his wife's medical bills – precluded him from seeking more regular treatment for his pain. See, e.g., Tr. at 87 (Blake's testimony that even though he wanted to return to Dr. Martino he did not because of his concerns about medical bills). Instead of examining the effect of Blake's limited resources on his ability to seek treatment, see, e.g., id. at 175 (Dr. Martino's February 1992 report stating that he discussed with Blake "further diagnostic and therapeutic options. He [Blake] is concerned about the expense of these situations and wishes to pursue a [nerve root] block before any further tests are performed"), the ALJ only made a passing remark that he was "mindful of the claimant's difficulties maintaining insurance," id. at 248. Requiring the ALJ to give fuller consideration to the effect of Blake's financial hardship on his treatment options is particularly appropriate given that "the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished."

Jones v. Sullivan, 804 F. Supp. 1398, 1403 (D. Kan. 1992) (citing

Dvorak v. Celebrezze, 345 F.2d 894, 897 (10th Cir. 1965)).

2.   Non-Medical Evidence and the *Avery* Factors

In addition, I conclude that the ALJ's credibility

determination was deficient because it only addressed a few of

the pertinent Avery factors.  Furthermore, with respect to those

factors he did consider, the ALJ either misconstrued or ignored

evidence in the record.  See, e.g., id. at 1406 ("In this case,

the ALJ improperly abstracted the evidence to support a denial of

benefits.  The decision mischaracterizes or ignores evidence

favorable to the plaintiff and overemphasizes evidence favorable

to the [Commissioner].") (internal citation omitted).

a.  *Blake's Daily Activities*

To be found disabled, a claimant must show that he cannot

perform "'substantial gainful activity,'" not that he is

"'totally incapacitated.'" Id. at 1405; see also Baumgarten v.

Chater, 75 F.2d 366, 369 (8th Cir. 1996) ("To establish

disability, [a claimant] need not prove that her pain precludes

-24-

all productive activity and confines her to life in front of the television."); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)("[W]e note that a claimant need not prove she is bedridden or completely helpless to be found disabled."). To be capable of substantial gainful activity, a claimant must be able to perform "substantial services with reasonable regularity either in competitive or self-employment." Thomas, 876 F.2d at 669 (citation omitted). That is, a claimant must be able to perform the required acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. (citation omitted); Allred v. Heckler, 729 F.2d 529, 533 (8th Cir. 1984) (citing McCoy v. Schweiker, 683 F.2d 1138, 1146 (8th Cir. 1982) (en banc)).

Accordingly, a claimant's ability to engage in limited daily activities, including light housework, is not necessarily inconsistent with "the inability to perform substantial gainful activity." See Hatfield, 1998 WL 160995, at *7 (finding that claimant's activities did not "speak to her ability to alternate

-25-

sitting and standing throughout the day"); see also Ghant v. Bowen, 930 F.2d 633, 638 (8th Cir. 1991) (holding that claimant's ability to do light housework, fish, and play dominos did not necessarily indicate that he could perform full-time light work).

In the present case, the ALJ gave the evidence of Blake's daily activities cursory consideration, noting only that Blake walked several times a week and performed some household chores. See Tr. at 249. Because the ALJ apparently ignored the evidence of Blake's limitations, he must be deemed to have "improperly abstracted evidence" to conclude that Blake was "'fairly active.'" See Jones, 804 F. Supp. at 1406 (observing that ALJ ignored claimant's limitations including her inability to perform yard work and vacuum and her need for assistance when grocery shopping).

To determine whether Blake's daily activities evinced his ability to perform substantial gainful activity on a daily basis, the ALJ needed to examine more precisely the evidence of Blake's routine and limitations. For example, Dr. Brassard's treatment

notes show that, as of March 1991, Blake was walking three to five days a week. See Tr. at 159. Blake testified, however, that he could walk, at a slow pace only, for approximately fifteen to twenty minutes before he had to stop. See id. at 64. Similarly, the evidence showed that Blake performs only a limited range of household chores. For example, Blake occasionally prepares breakfast – pouring a bowl of cereal or making toast – for his autistic son. Most days, his wife lays out breakfast for their son. See id. at 80. Blake's other household chores include vacuuming his family's small mobile home. Blake testified, however, that he was able to do so only with his son's assistance and that he can push, but not pull, the vacuum. See id. at 81-82. According to Blake, he sometimes washes dishes but not for more than ten minutes because of his inability to stand in one place for any period.[8] See id. at 82.

In addition to superficially treating the evidence of

---

[8] This testimony is consistent with other parts of Blake's testimony in which he stated that he can stand for about fifteen minutes and that his pain is triggered by standing in one place for too long. See, e.g., Tr. at 64, 73.

Blake's ability to walk and perform household chores, the ALJ ignored all together other evidence of Blake's limitations which might suggest Blake's inability to perform substantial gainful activity. For example, both Blake and his wife testified that he has difficulty sleeping. According to Blake, he is able to sleep, at most, for two to two and one-half hours each night; prior to his injury, he was able to sleep for eight hours. <u>See</u> <u>id.</u> at 74-75, 93. Blake's wife also testified that she sometimes – approximately two to three times per week – has to give Blake his pain medication during the middle of the night. <u>See</u> <u>id.</u> at 93-94. In addition, the ALJ made no mention of: (1) Blake's difficulty dressing himself, including occasionally requiring his wife's assistance, <u>see</u> <u>id.</u> at 78-79; (2) his inability to lie down during the day because of the difficulty he has getting up, <u>see</u> <u>id.</u> at 74; (3) his lack of hobbies and limited social interaction, <u>see</u> <u>id.</u> at 134 ; and (4) the impact of his injury, and resulting pain, on his family relations, including his intimate relationship with his wife, <u>see</u> <u>id.</u> at 70, 95.

**b.** *Duration, Frequency, and Intensity of Pain*

Although the ALJ acknowledged that Blake is in chronic pain, see id. at 249, he concluded that this pain does not further erode Blake's functional ability to perform a limited range of light work. Blake testified, however, that he suffers not only from a constant pressure on his lower back, but also suffers from short, intense peaks in his pain. See id. at 63. On a scale of one (minor irritation) to ten (injection at hospital), Blake rated his average pain level at a six or seven. See id. at 289.

**c.** *Precipitating and Aggravating Factors*

According to Blake, sitting or standing in one position for an extended period triggers the intense peaks in his pain. See id. at 64. Sitting back in a chair exacerbates the pressure he feels in his lower back. See id. at 76. Blake also testified that he can sit in a chair like the one in the hearing room for about fifteen minutes before he needs to stand up. See id. at 73. Although the ALJ was entitled to factor into his credibility determination his own observations of Blake at the hearing,

see Ortiz v. Secretary of Health and Human Servs., 890 F.2d 520, 523 (1st Cir. 1989) (per curiam), he made no mention of Blake's need to change position frequently during the hearing. See, e.g., Tr. at 63, 73 (comments of Blake's representative noting Blake's need to change position).

### d. *Type, Effectiveness, and Side Effects of Medication*

According to the ALJ, Blake has made only a limited use of medication to manage his pain. See id. at 248. The evidence shows, however, that ALJ's characterization of Blake's use of medication is inaccurate.

Since at least 1989, Dr. Brassard prescribed both Motrin and Darvocet to treat Blake's pain. See id. at 153 (Dr. Brassard's December 1, 1989 treatment notes). In response to Blake's complaint that the Motrin and Darvocet were ineffective, Dr. Brassard prescribed Tylenol Three (i.e., Tylenol with codeine) in December 1992. See id. at 163. In addition, there is evidence in the record that Blake also has been prescribed Medrol

Dosepak,[9] Flexeril,[10] and Naprosyn.[11]  See id. at 191-95.

Furthermore, the ALJ failed to consider the evidence regarding the side-effects of Blake's medications.  For example, Dr. Brassard's February 1992 treatment notes indicate that Blake discontinued his use of phenobarbital and expressed his preference for no sedation because the medicine had made him "ugly."  See id. at 163.  Similarly, Blake discontinued his use of Motrin after he experienced rectal bleeding.  In place of Motrin, Blake began to take twenty aspirin per day.  See id. at 64-65.  Blake testified, however, that excessive aspirin use

_____

[9]     Medrol is the trademark for preparations of methylprednisolone.  Dorland's Medical Dictionary 1000 (28th ed. 1994). Methylprednisolone is used as an anti-inflammatory.  Id. 1032.

[10]     Flexeril is prescribed, in conjunction with rest and physical therapy, "for relief of muscle spasm associated with acute, painful musculoskeletal conditions."  Physicians' Desk Reference 1656 (52nd ed. 1998)

[11]     Naprosyn is prescribed for the treatment of "rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and juvenile arthritis. . . . [It also is prescribed] for treatment of tendinitis, bursitis, acute gout, and for the management of pain and primary dysmenorrhea."  Physicians' Desk Reference 2458-59 (52nd ed. 1998).

upsets his stomach.  See id. at 290.  Blake also stated that when he takes Darvocet he feels like things move from side to side and if he tries to fixate on something he becomes nauseous.  See id. at 287.

### e.  *Treatment, Other than Medication*

The ALJ reasoned that if Blake's pain were as severe as he claimed, treatment notes would have included "more frequent and involved discussion of pain management . . . Yet, more often than not, Dr. Brassard's treatment notes contain no mention whatsoever of strategies to address the claimant's pain."  Id. at 248-49. Again, the ALJ overstated the importance of the absence of certain evidence.

First, Dr. Brassard is Blake's treating physician for his general health; he is concerned about all of Blake's health problems, including degenerative arthritis, obesity, and hypertension, see id. at 157, not only Blake's back pain.  As a result, it is not surprising that Dr. Brassard's treatment notes from each of Blake's visits do not include comments on or

observations of Blake's back condition and pain. See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997) (holding that there were no inconsistencies in record to justify finding claimant not credible because the "lack of information contained in any of the reports completed by [the claimant's] doctors does not qualify as an inconsistency in the evidence as a whole. The medical reports certainly made no attempt to catalog [the claimant's] every pain and her behavior resulting from the pain").

Second, the record includes evidence indicating that Blake did seek forms of treatment other than medication. For example, in July 1988, Dr. Ramos administered nerve block shots, ultra-sound, and heat packs. He also sent Blake to physical therapy. See Tr. at 166 (Dr. Porter's December 1988 treatment notes). Dr. Brassard also treated Blake with a nerve block injection. See Id. at 132 (December 1993 disability report).

Moreover, the ALJ's analysis of the evidence of alternative treatment he did mention was inadequate. The ALJ, in part, based his adverse credibility finding upon what he characterized as

Blake's "good response to even a short period of physical therapy in July 1988." Id. at 249. The only support for this conclusion appears to be two comments: (1) a comment, "[o]ngoing improvement," in a physical therapist's September 6, 1988 progress notes, see id. at 193; and (2) Blake's comment to Dr. Porter in 1988 that he experienced slight improvement due to the physical therapy, see id. at 166. The ALJ never asked Blake why he discontinued physical therapy in October 1988. It is unclear whether Blake unilaterally decided to discontinue physical therapy or whether his doctor recommended that he stop. The physical therapist's final set of progress notes, dated October 7, 1988, only indicates, after the "Treatment" heading, "[d]iscontinue physical therapy." See id. at 195. Before he could make an adverse credibility determination on this basis, the ALJ should have developed evidence of whether and how physical therapy improved Blake's condition and the reason for its discontinuation.

## IV. CONCLUSION

Because the ALJ overstated the importance of corroborating objective medical evidence and improperly applied the Avery factors, I conclude that his decision to discredit Blake's complaints of pain is not supported by substantial evidence. See Da Rosa, 803 F.2d at 26 (holding that remand appropriate where ALJ's credibility determination is not supported by substantial evidence because ALJ failed to consider requisite factors). Accordingly, I reverse the Commissioner's decision. On remand, the ALJ should reassess Blake's credibility in light of all of the Avery factors. The ALJ's adverse credibility determination also influenced his decision to discount the opinion expressed by Dr. Brassard in his June 1, 1995 letter. As a result, the ALJ should reassess the weight to which Dr. Brassard's opinion is entitled in light of a proper credibility analysis.

Plaintiff's Motion to Reverse and Remand (doc. no. 6) is granted. Because I act pursuant to sentence four of 42 U.S.C. § 405(g), the Clerk is instructed to enter judgment in accordance

with this order.  See <u>Shalala v. Schaefer</u>, 509 U.S. 292, 297, 298 (1993).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 28, 2000

cc:  David Broderick, Esq.
     Raymond Kelly, Esq.