**Dawn A. LOGSTON, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

No. 4:07cv00282–JAJ.

United States District Court,
S.D. Iowa,
Central Division.

July 3, 2008.

Charles E. Binder, Binder & Binder PC, New York, NY, Robert J. Engler, Schulte Hahn Swanson Engler & Gordon, Burlington, IA, for Plaintiff.

Richard L Richards, U.S. Attorneys Office, Des Moines, IA, for Defendant.

### ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the court pursuant to briefs on the merits of plaintiff's application for Social Security Disability and Supplemental Security Income benefits [dkt. 9, 12]. The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Dawn Logston[1] applied for Disability Insurance Benefits and Supplemental Security Income benefits on December 12, 2001, alleging an inability to work since November 14, 2000 (Tr. 66–68). Logston's application was denied on initial review and again on reconsideration (Tr. 47–55). A hearing before Administrative Law Judge (ALJ) Ralph J. Muehlig was held on April 9, 2003 (Tr. 425–55). The ALJ denied Logston's appeal in a decision dated April 25, 2003 (Tr. 31–42). On March 12, 2004, the Appeals Council vacated the April 25, 2003 decision of the ALJ and remanded the matter for further proceedings (Tr. 247–50). A second hearing was held before the ALJ on March 30, 2005, at which Logston submitted supplemental evidence (Tr. 456–73). In a decision dated May 16, 2005, the ALJ again concluded that Logston was not disabled within the meaning of the Social Security Act (Tr. 16–26). On May 10, 2007, the Appeals Council denied Logston's request for review (Tr. 8–10). This action for judicial review was filed on June 26, 2007.

1. Due to divorces and remarriages, some of the medical records appear in the name of Dawn Lorenzo. For ease of reference, the plaintiff will be referred to throughout this opinion as Logston.

## II. FACTUAL BACKGROUND

### A. Medical History

Logston treated her chronic neck and back pain with Dr. George T. Kappos, M.D. of the Iowa Health Physicians—Ankeny Clinic on a monthly to bi-monthly basis from November 1999 through February 2002, when she moved back to New Jersey (Tr. 126–68). Dr. Kappos diagnosed Logston with chronic neck and back pain secondary to degenerative disc disease (Tr. 127). Medications prescribed by Dr. Kappos include Kepakote, Lorcet, Lorazepam, Nortriptyline, Lortab, Salsalate, Amitriptyline, Celexa, OxyContin, Oxycodone, Flexeril, and Relafen (Tr. 126–68). Dr. Kappos' March 29, 2000 examination of Logston revealed "tenderness to palpation in the left sacroiliac area." (Tr. 163). She was able to flex her back to about 90 degrees, her straight leg raising was negative, and her deep tendon reflexes were normal (Tr. 163). Dr. Kappos diagnosed Logston with "[c]hronic back pain, stable to improved." (Tr. 163). Dr. Kappos encouraged Logston to continue regular exercise. (Tr. 163). On July 27, 2000, Logston was examined by Dr. Kappos, which revealed decreased flexion and extension of her neck, but no cervical tenderness and full range of motion of her neck otherwise (Tr. 157). Her upper extremities were normal, although there was "some tenderness" over her thoracic spine. (Tr. 157). Dr. Kappos gave Logston a work excuse for July 26 and 27, 2000 (Tr. 157). Logston's August 15, 2000 visit with Dr. Logston revealed a "fairly normal" range of motion of her neck (Tr. 156). Logston did have some "slight limitation of extension, but the rest of range of motion [was] completely normal." (Tr. 156). She had "some tenderness over C6–C7 on palpa-

tion of the neck," but "[d]eep tendon reflexes of the upper extremities [were] normal." (Tr. 156). Cervical spine x-rays were obtained and were normal to Dr. Kappos' reading (Tr. 156). Logston saw Dr. Kappos on December 26, 2000 (Tr. 148). She was unable to tip her head back, but had full range of motion of the cervical spine otherwise (Tr. 148). She was unable to raise her arms above shoulder level without pain, but her low back was unremarkable. (Tr. 148). On January 26, 2001, Logston's visit with Dr. Kappos revealed "decreased extension of the neck with pain with extension. Range of motion of the neck is otherwise unremarkable. Low back shows full range of motion. Straight leg raising is positive at 90 degrees on the left." (Tr. 132). Except for a small, slightly tender soft-tissue mass on the right side of her neck consistent with a subaceous cyst, Dr. Kappos' examination of Logston's neck on February 26, 2001 was unremarkable (Tr. 131). Logston's low back tenderness continued, but there were no other changes in her back examination (Tr. 131). Dr. Kappos' examination of Logston on March 26, 2001 revealed "increased soft tissue inflammation in the lumbosacral area which has not been present before" (Tr. 130). Dr. Kappos examined Logston on May 18, 2001 wherein she had "fairly marked tenderness and spasm in the right lumbar paraspinous muscles. Straight leg raising is positive and 90 degrees on the right." (Tr. 146). Dr. Kappos examined Logston on July 16, 2001 wherein she developed pain with flexion of her lumbar spine beyond 75 degrees, but had full range of motion of her back otherwise (Tr. 142). Logston saw Dr. Kappos on September 12, 2001, during which visit she admitted that she had been taking her father's oxycodone (Tr. 139). Dr. Kappos' notes state: "Reinforced that she needs to not be taking her father's medications, and she

needs to get established on a medication program. If she continues to not follow our instructions, we will not continue to treat her." (Tr. 139). Logston's examination on November 26, 2001 revealed neck flexion to "30 degrees, almost no extension, can turn to the right only 25 degrees and to the left 80 degrees. Lumbar ROM is flexion 45 degrees and backward bending 10 degrees." (Tr. 133). Dr. Kappos' notes of Logston's December 18, 2001 visit state: "Discussed with the patient the importance to limit her medication to the amount that is suggested. Explained to her that going above the recommended amounts is not going to help her pain further as she will reach a threshold resistance to medication, and she will increase her chances of side effects and ineffectiveness of the medication." (Tr. 128). At Logston's January 16, 2002 visit, Dr. Kappos "[e]ncouraged her to get more active as she is sitting not doing much. Stressed to her the importance of regular activity and keeping her muscles loose as she is tightening up significantly more." (Tr. 127).

Logston began treatment with Dr. Donna J. Bahls, M.D. on September 25, 2000, at the request of her workers' compensation carrier, regarding an injury she sustained on July 25, 2000, when an inebriated patron at the bar she was working in tried to "dip" her and they both fell (Tr. 85–93). Dr. Bahls ordered an MRI scan of Logston's spine, which was conducted on September 27, 2000 (Tr. 80). Dr. Bahls reviewed the findings of the MRI with Logston at her October 6, 2000 visit (Tr. 90). Dr. Bahls' notes of this visit state, in relevant part:

She has moderately severe disc degeneration particularly for the age of the patient, with a broad based disc herniation, most notably to the right. There was no nerve root impingement. She also had

modest diffuse disc bulging at C4–5 and C6–7. Her thoracic spine was unremarkable. In the lumbar spine she had degenerative disc disease at L4–5, but no frank herniation or nerve impingement. (Tr. 90).

Dr. Bahls' notes from Logston's December 1, 2000 visit state, in pertinent part: "She reported that she quit her job November 14 because she felt she was getting harassment from her boss. She earned $11.50 per hour and she does not feel she can find another sedentary job that will pay as well. She is applying for Social Security Disability." (Tr. 88). Logston saw Dr. Bahls again on January 5, 2001. Dr. Bahls' notes from this visit state:

> She is unable to work at this time because her dad can not do the babysitting for her youngest son and she has had him on a waiting list for one year for a day care. The patient could be working if she were able to in her social situation.

(Tr. 86). Dr. Bahls discussed her findings with Logston in a January 24, 2001, telephone call (Tr. 85). Dr. Bahls' notes of this telephone conversation state:

> The patient had called on January 12, 2001, and January 22, 2001, regarding her work release. I was able to discuss with the patient today. The patient understood me to say I would support her in applying for Social Security Disability. I informed the patient that I did not recall that conversation and that she informed me she was applying for Social Security Disability. I explained to the patient that I had not removed her from her sedentary job and she had quit on her own. I explained that she may get

on Social Security Disability with her spine problems, but that I had not said that she could not work. I also discussed with her that I understood with her social situation and with her dad needing supervision, that it was difficult for her to work at this time. She would like a copy of her MRI films to be sent to Dr. Kappos and I explained to her to contact our office's radiology department and make that request and they would be sent.

(Tr. 85).

Upon relocating to New Jersey, Logston began treating with Dr. James L. Garofalo, M.D. (Tr. 173–75; 196–203; 229–34; 238–39; 274–84; 286–87; 302–10). Dr. Garofalo first examined Logston on April 8, 2002 (Tr. 173). In a report submitted to Disability Determination Services dated July 23, 2002, Dr. Garofalo noted physical findings regarding Logston's condition to include no flexion of lumbar spine, no extension, continuous tenderness of entire lumbar spine with spasms (Tr. 173). In support of these findings, Dr. Garofalo cites to an MRI of Logston's lumbar spine taken in February 2000 [2] (Tr. 173). In a Multiple Impairments Questionnaire dated September 17, 2002, Dr. Garofalo diagnosed Logston with degenerative disc disease of the lumbar and cervical spine and osteoarthritis of the entire spine and opined that her prognosis was poor (Tr. 196–203). Dr. Garofalo opined that Logston could sit for zero to one hour in an eight-hour workday and could stand for zero to one hour (Tr. 198). After rating her various limitations, Dr. Garofalo ulti-

---

**2.** Findings from the February 2000 MRI include: Disc dessication at the L4–5 level ... A small amount of Gadolinium enhancement is seen in the posterior aspect of the disc at the L4–5 level relating to previous surgery. There is mild annular bulge at the L4–5 level.

No definitive areas of critical spinal stenosis or compromise of the neural canal are seen ... Allowing for described changes at the L4–5 level, all remaining discs in the lumbrosacral spine appear normal (Tr. 235).

mately opined that Logston is unable to work (Tr. 202).

In a letter to Logston's attorney, dated March 4, 2003, Dr. Garofalo diagnosed Logston with "degenerative disc disease of the cervical and lumber [sic] spine and Osteoarthritis of entire spine." Dr. Garofalo further stated that no physical therapy was recommended at this time and that Logston's prognosis was poor (Tr. 238–39).

A March 20, 2003, MRI of Logston's spine revealed the following: "a small subligamentous disc herniation at L4–5. There is no evidence of spinal or foraminal stenosis at this or any level. The upper three intervertebral disc levels and L5–S1 demonstrate no evidence for additional disc disease. The lumbar vertebral bodies demonstrate normal height ... The conus nedullaris and roots of the cauca spine are normal." (Tr. 236).

Logston had another MRI of her lumbar and cervical spines on May 25, 2004 (Tr. 286–87). Pertinent findings regarding her lumbar spine include:

Disc dessication with mild disc space narrowing is seen at L4–5. There is associated central disc bulging at L4–5. This finding was present on earlier study of August, 1998 and is little changed, although there may be very slight further disc space narrowing noted on the current study. No central or lateral recess stenosis is noted and no foraminal stenosis is seen.

The radiologist's relevant impressions of her lumbar spine were: "Mild discogenic change, L4–5, with mild disc space narrowing and disc dessication. Slight bulging at L4–5. No abnormal enhancement pattern is noted on the post Omniscan enhanced images." With respect to her cervical spine, the radiologist noted "[m]oderatesized central C5–6 disc herniation with loss of cervical lordosis and spondylitic change."

In a "Spinal Impairment Questionnaire" completed on July 7, 2004, Dr. Garofalo again opined, among other things, that Logston was unable to work (Tr. 303–10). In a letter to Logston's attorney, dated July 9, 2004, Dr. Garofalo stated:

I continue to see Ms. Logston on a monthly basis for severe osteoarthritis and Degenerative Disc Disease. Occasional [sic], when her pain is very severe I see her bimonthly.

The patient was last seen today, July 9, 2004. Her complaints remain the same. Exam showed continued pain and stiffness in the cervical spine and severe pain in the right sacral iliac joint. Her gait is poor and she needs the assistance of a cane. Her activities are very limited due to the debilitating pain. I prescribed Lorcet 10/650 and Soma 350 mg. Enclosed is a copy of MRI done on 5/25/2004, which shows a disc herniation at C5–6.

Prognosis is poor. I believe these conditions are permanent. I do not believe she will be able to return to any type of work within the next 12 months or if ever.

(Tr. 302).

Logston had an MRI of her lumbar spine done on December 22, 2005, which was ordered by Dr. Joseph Dryer, M.D. of the Center for Orthopedics in West Orange, New Jersey (Tr. 422A). Logston was seen by Dr. Dryer on January 26, 2006, in follow up (Tr. 422). According to Dr. Dryer's notes, the MRI of December 22, 2005, showed "a small disc herniation at L4–5 centrally and on the right." (Tr. 422). Dr. Dryer opined that Logston's underlying problem was most likely degenerative disc disease (Tr. 422). Dr. Dryer referred Logston to have a consultation with Dr. Kenneth J. Kopacz, M.D. of Spine

Care and Rehabilitation, Inc. regarding total disc replacement (Tr. 422).

On February 6, 2006, Logston had a CT scan of her lumbar spine, which revealed, in relevant part: "No disc space narrowing or paraspinal masses are seen. The posterior elements are normal. The pedicles, lamina, transverse, and spinous processes are normal." (Tr. 418).

Logston was evaluated by Dr. Kopacz on February 7, 2006 (Tr. 423–24). Dr. Kopacz's notes state, in pertinent part:

> Ms. Lorenzo is a 43–year–old woman whose chief complaint is "I have no feeling from my neck and down." . . . She complains of constant back and neck pain and again reiterates there is no feeling from her neck down. She has been tried on multiple therapies, including physical therapy, pool therapy, massage therapy, and leg exercises. . . . Her motor exam shows 5/5 strength grossly of her upper and lower extremities . . . I have reviewed an MRI taken of her lumbar spine, which was done in December of 2005, which showed an L4–L5 disc disruption with internal changes and a bulging disc at that level, with a slight herniation. I also reviewed a CAT scan, which showed what appeared to be a hemangioma at the L2 level and otherwise is unremarkable . . . We had a long discussion today about the etiology of her pain, which I think is a combination of discogenic pain from L4–L5, as well as chronic pain syndrome, which seems to be the primary source of her current complaints. I believe with her chronic pain and symptom magnification any surgical intervention would not benefit the patient at any reliable degree. I would not recommend fusion or disc replacement at this time for the disc disruption. We discussed today the best avenue for treatment would be for elimination of the high-dose narcotics that

she is currently on. If she could slowly wean herself from these medications, I believe she would have a better chance of success with surgery. We discussed this with her. She understands this and really was only concerned with applying for disability. We discussed that with her also.

(Tr. 423–24).

On February 9, 2006, Logston was seen by Dr. Dryer (Tr. 420). Dr. Dryer's notes of this visit state:

> Ms. Lorenzo is seen in follow up. We have reviewed the lumbar CT scan, which is consistent with hemangiomas at L2 with no significant change from prior studies. Observation is indicated. The patient had a consultation with Dr. Kopacz regarding total disc replacement. He does not believe that the patient is a candidate for total disc replacement. I do not believe that she is a candidate for surgery as well . . . Therefore, continued conservative treatment and pain management is recommended.

(Tr. 420).

### B. Psychological History

At her May 15, 2000, visit with Dr. Kappos, Logston stated that she had been under a lot of stress because she had multiple appliances break down in her house and because she is worried that the company she worked for was going out of business (Tr. 160). She stated that "she does feel like she is becoming somewhat depressed, but does not feel that she is significantly depressed." Logston further reported that she had "been on treatment for depression in the past and does not feel as bad as she did then." (Tr. 160). Dr. Kappos diagnosed her with situational anxiety (Tr. 160). On June 12, 2000, Logston saw Dr. Kappos, at which visit she complained of having a very stressful week as her marriage was ending (Tr. 159). At her

April 9, 2001, visit with Dr. Kappos, Logston discussed problems with acute stress, stemming from financial difficulties and the fact that her young sons were living with their father (Tr. 129). Dr. Kappos diagnosed Logston with acute situational anxiety (Tr. 129). Logston complained of anxiety at her April 23, 2001 visit, but stated that it had improved, as her housing situation had stabilized (Tr. 147). At Logston's November 12 and 26, 2001, visit with Dr. Kappos, she again discussed her depression, which she attributed to her financial situation and losing custody of her sons (Tr. 133, 134). Dr. Kappos noted that Logston's depression had improved at the November 26th visit (Tr. 133).

Logston underwent a mental status exam by Dr. Robert A. Straight, Ph.D., at the request of Social Security Administration (SSA) on January 24, 2002 (Tr. 120–24). Notes from Dr. Straight's evaluation state, in pertinent part:

> "During the interview, it became apparent that any memory complaints were tied to her pain medications, which have since been changed. She noted that she is no longer experiencing difficulty with memory ... In the last twelve months, her family physician, Dr. Kappos, has attempted Nortriptyline and most recently Celexa. She was on the Celexa for approximately four to six week and terminated this two weeks ago as she felt it did not help. She is reluctant to re-initiate antidepressant therapy because of concerns about side effects such as dry mouth and sexual dysfunction ... She stated that she finds herself crying at the 'drop of a hat.' ... I see no cognitive deficit that would prevent understanding instructions, procedures, or locations. Attention and concentration are within normal limits. Pace would be the primary concern regarding employment."

(Tr. 120–24).

Dr. Wright reviewed the records of Dr. Straight's evaluation and opined that Logston was mildly limited in her activities of daily living and in maintaining social functioning, and was moderately limited in her ability to carry out detailed instructions and maintaining concentration, persistence, pace, and attention for extended periods (Tr. 175–94). Dr. Wright's notes, prepared on February 6, 2002 state, in relevant part:

> The evidence in file would support some moderate cognitive restrictions of function·secondary to the claimant's variable attention and concentration. The claimant would have difficulty consistently performing extremely complex cognitive activity that would require prolonged attention to minute details and rapid shifts in alternating attention. Despite this restriction, the claimant is currently able to sustain sufficient concentration and attention to perform a range of non complex, repetitive, and routine cognitive activity when she is motivated to do so.
>
> ...
>
> In summary, the evidence in file indicates the claimant is diagnosed with medically determinable mental impairments—Depression (not otherwise specified) and a Pain Disorder associated with both Psychological Factors and a General Medical Condition. The claimant's diagnosed medically determinable mental impairments do create some moderate restrictions of function for the claimant; but these restrictions of function do not currently meet or equal 12.04 or 12.07 listing severity. The claimant's allegation is credible. Evidence in file is

consistent and does reflect the claimant's limitations of function as described. (Tr. 191–192).

Logston underwent another mental status evaluation on June 7, 2004, by Dr. Edward J. Linehan, Ph.D., at the request of SSA (Tr. 288–91). Dr. Linehan's notes state, in pertinent part:

"She [Logston] states that as a result of her inability to work and constant pain, she struggles with depression on a daily basis ... She is currently not on any antidepressant medication. She does not see a psychiatrist or psychotherapist at the present time ... She has been on some antidepressants in the past for the pain, but she is reluctant to re-initiate antidepressant therapy because of the side effects such as dry mouth and sexual dysfunction ... This patient appears to be functioning on the average range with some intellectual dysfunction, perhaps due to depression at the current time. Her condition appears to be functional relative to depression but secondary to the pain in her back. This condition should be expected to continue for the next 12 months."

(Tr. 288–91).

Logston was evaluated by Oraida Gandara, a therapist with the University of Medicine and Dentistry of New Jersey (Tr. 340–47). With respect to Logston's cognitive functioning, Gandara made the following findings: Level of Consciousness: Alert; Orientation (to person, place, time, circumstance): Fully Oriented; Intelligence (based on vocabulary and ability to conceptualize): Average; Memory (repeat three objects, accurate, verifiable history): Intact; Abstract Thinking (e.g.proverbs, similarities): Intact; Fund of Knowledge (as developmentally appropriate): Good; Insight (as developmentally appropriate): Good; Judgment (as developmentally appropriate): Good (Tr. 346). Gandara assessed Logston's current GAF as 60, which indicates moderate symptoms or difficulty in functioning (Tr. 347).

On August 26, 2004, Logston was treated in the Saint Clare's Hospital Emergency Department for major depression after her ten year-old son found her and could not awaken her and called 911 (Tr. 323–39). Logston admitted to smoking marijuana as needed to increase her appetite, approximately three to four times per week (Tr. 327). Notes from this hospitalization state, in pertinent part:

Client is not truthful about medications feels she is not taking too much and denied using street drugs—she is positive for cocaine, marijuana, benzos & opiates—later she accused screener of not asking about street drugs & reported "of course I smoke pot during the week so I can get an appetite to eat, how else can I eat?"

(Tr. 329).

On December 8, 2004, Logston again was treated in the Saint Clare's Hospital Emergency Department for severe depression and chronic pain (Tr. 312–22). Logston admitted to smoking marijuana three to four times per week to help her appetite (Tr. 317).

### C. Hearing Testimony

Hearings before an ALJ were held in this matter on April 9, 2003, and March 30, 2005 (Tr. 425–73). At the April 9, 2003 hearing, Logston testified that her back condition has progressively worsened and that she's been told by every specialist that there is nothing they can do and that she will be on pain medication for the rest of her life (Tr. 430). Logston testified that her orthopedic problems developed when she was bartending and a patron tried to dip her, lost his balance, and fell on her when her neck was bent back, which made her cervical and lumbar disc disease and

osteoarthritis conditions progress faster than it normally would have (Tr. 436). Logston testified that she is unable to lift, cannot sit at a desk for more than ten to fifteen minutes at a time, and has trouble concentrating due to the pain (Tr. 444). Logston described her pain as constant, sometimes being a dull ache and other times a stabbing pain (Tr. 445). Logston testified that she has pain in her lower back, which radiates down her right leg constantly, and that she has pain in her cervical spine, which makes both arms numb and occasionally spasm (Tr. 445). Logston testified that she has not had any physical therapy because, although it was recommended, she was told that it would not help (Tr. 445–46).

Regarding her daily activities, Logston testified that she spends about seven hours out of an eight hour day in her recliner with her feet up on a heating pad, getting up and moving around every fifteen minutes or so (Tr. 446, 448). Logston testified that she can sit in a regular chair for about fifteen minutes before she has to shift around, get up and walk around, which she can do for approximately five to ten minutes (Tr. 446–47). Logston testified that she could walk approximately a half of a block to a block before and that she can stand on her feet for five to ten minutes (Tr. 447). Logston testified that she can only sleep for a half hour to an hour before she wakes up in pain (Tr. 448).

At the March 30, 2005, hearing, Logston testified that on an average day she lays in bed approximately ninety percent of the time, either on her side or with a pillow under her leg, getting up every once in a while and moving to her recliner, where she lays (Tr. 466, 467). She testified that she cannot stand long enough to cook or clean, and that her husband takes care of their six and ten year-old children (Tr. 466). Logston testified that she can sit comfortably before needing to change positions ten minutes at the most (Tr. 466). She testified that she can walk about fifteen feet while using both canes (Tr. 466–67).

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. *See Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992); *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1991); *Cruse,* 867 F.2d at 1184; *Taylor v. Bowen,* 805 F.2d 329, 331 (8th Cir.1986). The court must take into account evidence that fairly detracts from the ALJ's findings. *Cruse,* 867 F.2d at 1184; *Hall v. Bowen,* 830 F.2d 906, 911 (8th Cir.1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Cruse,* 867 F.2d at 1184 (quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. *Gunnels v. Bowen,* 867 F.2d 1121, 1124 (8th Cir.1989); *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuc-*

*kert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The five steps are:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1364 n. 3 (8th Cir.1990). (citing *Yuckert,* 482 U.S. at 140–42, 107 S.Ct. 2287); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *Id.*

Under the first step of the analysis, the ALJ found that Logston had not engaged in substantial gainful activity since her alleged onset date (Tr. 25). At the second step, the ALJ determined that Logston's cervical and low back pain syndrome and depression are, in combination, severe impairments (Tr. 25). At the third step, the ALJ determined that Logston's impairments did not meet or equal one of the listed impairments (Tr. 25). At the fourth step, the ALJ determined that Logston was able to perform her past relevant work as a customer service representative/clerk, and therefore, is not disabled (Tr. 26).

### C. Listed Impairment

Listed Impairment 1.04A states:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

In finding that Logston did not meet listing 1.04A, the ALJ noted:

Clinical examinations have not shown evidence of any neurological deficits radiating to the upper and/or lower extremities and examinations have been consistent with tenderness and limitation of motion of the cervical and lumbosacral aspects of the spine (Exhibits 2F, 9F, 11F, 14F, 26F). The evidence is devoid of nerve root compression, motor loss, atrophy with associated muscle weakness, sensory loss, reflex loss, spinal stenosis, or spinal arachnoiditis required to meet the level of severity contemplated in section 1.04.

(Tr. 21).

Logston argues that she is disabled per se under Listing 1.04A. In support of her argument, Logston cites the May 2004 MRI, the December 2005 MRI, and the medical records evidencing radiating pain, muscular atrophy/weakness due to disuse, as well as positive straight-leg testing on both sides.

The defendant contends that the ALJ properly determined that Logston did not meet or equal Listing 1.04A because the medical records cited by Logston include only her own reports and are inconsistent with the other records as set forth by the ALJ. The defendant further notes that Logston does not document physical findings based on objective observation which continued for a 12 month period.

■ The ALJ did not err in concluding that Logston does not meet Listing 1.04A. The evidence does demonstrate that Logston suffers from degenerative disc disease resulting in slight compression of the nerve root, and has had, on occasion, limited range of motion of the spine as well as positive straight leg raising. However, there is no credible evidence that she has motor loss, sensory loss or reflex loss. Dr. Dryer's neurological examination of Logston was normal. Dr. Bahls' treatment of Logston consistently found intact strength and reflexes. Dr. Sawicki's consultative examination of Logston found her muscle strength to be 5/5 and her grip and pinch strength to be 5/5. Finally, Dr. Kopacz's examination found Logston's strength to be 5/5 and her reflexes to be intact. The medical evidence demonstrates that Logston does not meet all of the requirements of Listing 1.04A.

## D. Treating Physician

With respect to Logston's treating physician, Dr. Garofalo, the ALJ's decision states:

The claimant, after moving to New Jersey, came under the care of Dr. Garafalo [sic], a family physician, in April 2002, who reported poor flexion and overall poor range of motion of the cervical and lumbar aspects of the spine (Exhibit 22F–23F). These findings are suspect and appear to be based solely on the claimant's own complaints and are not consistent with clinical findings of Drs. Kappos and Bahls.

Dr. Garafalo [sic] assessed in September 2002 and July 2004 that the claimant was limited to 0–1 hours of sitting; and 0–1 hours of standing and walking in an eight hour day; with no ability to lift and carry. Dr. Garafalo [sic] also reported that the claimant has an abnormal gait (Exhibits 14F, 27F). This assessment is not consistent with the overall record including objective medical evidence. There is no objective evidence documenting why the claimant would not have a normal gait and her previous treating physicians all encouraged regular activity. While I have reviewed Dr. Garafalo's [sic] objective findings, I do not give any weight to his assessment, which appears to be based solely on the claimant's subjective complaints and does not take into account the lack of objective neurological find-

ings. It is noted that Dr. Garafalo [sic] is a family physician and does not specialize in orthopedics.

(Tr. 24).

Logston argues that the ALJ erred in failing to give "controlling weight" to discrediting the opinion of her treating physician, Dr. Garofalo, who has consistently diagnosed Logston with degenerative disc disease and osteoarthritis of the entire spine, and repeatedly opined that she is incapable of even sedentary work. According to Logston, Dr. Garofalo's opinions are supported by ample objective medical evidence, as well as her subjective complaints. Specifically, she points to MRI scans conducted in September 2000, May 2004, and December 2005 (Tr. 80, 286–87, 422A), as well as her numerous visits to Dr. Garofalo which revealed neck and back pain, muscle spasm, tenderness, poor flexion, decreased range of motion and an abnormal gait. Logston argues that Dr. Garofalo's opinion is consistent with that of orthopedic surgeon, Dr. Dryer. Logston further claims that Dr. Garofalo's status as a family physician, rather than an orthopedic specialist, is not a basis upon which to discredit his opinion, especially considering that it is consistent with the opinion of Dr. Dryer.

The Commissioner argues that the ALJ properly found that Dr. Garofalo's opinion was not entitled to significant weight because it was inconsistent with the overall records, unsupported by the objective evidence, based solely on Logston's subjective complaints, and was from a family physician rather than an orthopedic specialist.

■ "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir.2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. *Piepgras v. Chater,* 76 F.3d 233, 236 (8th Cir.1996). *See also Thomas v. Sullivan,* 928 F.2d 255, 259 (8th Cir.1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

■ The ALJ did not err in giving Dr. Garofalo's opinion little weight. In March 2000 Dr. Kappos encouraged Logston to continue to get regular exercise. Following her work injury on July 25, 2000, Dr. Kappos gave Logston only a two-day work excuse. Dr. Kappos never opined that Logston was unable to work. To the contrary, at her January 16, 2002 visit, Dr. Kappos again encouraged Logston to become more active and stressed to her the importance of regular activity and keeping her muscles loose. Likewise, Dr. Bahls, who admittedly treated Logston on behalf of her workers' compensation carrier, never opined that Logston was unable to work. Rather, Bahls' notes indicate that

Logston quit working because she was being harassed and because she needed to provide childcare for her young son. Moreover, Dr. Garofalo's opinion is not consistent with the objective medical evidence in the file. For example, the March 2003 MRI of Logston showed no stenosis at any level and no evidence of additional disc disease. A May 2004 MRI found little change in disc space narrowing and associated disc bulging at L4–5 since August 1998 and no stenosis. A February 2006 CT scan of Logston's lumbar spine showed no disc narrowing. Finally, in February 2006, Dr. Kopacz opined that Logston was not a surgical candidate because of her chronic pain syndrome and symptom magnification. Dr. Kopacz did not opine that Logston was unable to work, but rather advised her to wean herself off of the high dose narcotics. Dr. Dryer concurred with Dr. Kopacz's opinion.

With respect to her mental capacity, Logston argues that the ALJ erred in concluding that her psychological impairments do not impose any functional limitations. Logston contends that the ALJ should have credited the February 2002 opinion of Dr. Wright that she was "moderately limited" in her ability to maintain attention and concentration for extended periods, to perform at a consistent pace, and to carry out detailed instructions. Dr. Wright's assessment, Logston contends, is consistent with that of her treating therapist, Oraida Gandara, and with the records of her 2004 treatment in the Saint Claire Medical Center emergency room.

The defendant argues that the ALJ's finding that Logston's depression was a severe impairment in combination with her back pain takes into account Logston's limitations with respect to understanding, remembering, carrying out instructions, responding appropriately, and dealing with usual work situations in a routine setting and precludes the performance of complex work. The defendant argues that the ALJ did not err in crediting the opinion of Dr. Straight, who actually examined Logston, over that of Dr. Wright, who merely reviewed her records.

In evaluating Logston's depression, the ALJ's decision states:

> The claimant has complained of depression secondary to pain. She is not under regular mental health care. She was examined by psychologists at the request of state agency in order to evaluate her mental status. Dr. Straight examined her in January 2002, while she was still living in Iowa. At this time she indicated that any memory loss she had previously reported was due to pain medication which was changed and she was no longer experiencing any memory problems. A mini-memory examination indicated that her memory was indeed intact. The claimant complained of tearfulness, loss of appetite and feelings of hopelessness and helplessness. She had recently been remarried, had financial problems and had given up custody of her children, her two older teenage daughters had moved to New Jersey to live with their father and her two younger boys, one a toddler, were living with their father. The claimant exhibited no signs of psychosis. Her affect was full, she presented as well kept and there was no evidence of cognitive defects. Dr. Straight reported that concentration and attention were within normal limits (Exhibit 8F).

> In June 2004 the claimant was examined by Dr. Linehan. She complained of depression and anxiety. Examination revealed that the claimant was well oriented, average intelligence and there were no signs of psychosis (Exhibit 25F). Both Drs. Straight and Linehan assessed that the claimant's global assess-

ment of functioning (GAF) was 65, consistent with mild symptoms. She was seen in an emergency room in December 2004 due to depression secondary to severe neck and low back pain and family problems (Exhibit 28F). New evidence submitted after the hearing revealed that the claimant was seen at UMDNJ, University Behavioral Health Care, on August 4, 2004. She denied anxiety, delusions, hallucinations or any psychosis. She admitted to using marijuana to sleep and relieve pain. Examination revealed that she was well groomed and eye contact was good. Mood was depressed but affect was full and thought process was unremarkable. The claimant was alert, she was fully oriented and memory was intact. Judgment and insight were good (Exhibit 29F). Although therapy was recommended, there is no documentation that the claimant pursued this avenue of treatment.

The claimant has not reported any social problems and interacts well with others. Dr. Straight assessed that he [sic] claimant got along with others; that she had good judgment; and that she had the ability to respond to changes in a workplace (Exhibit 8F). Presently, the claimant cares for her two young sons, and previously while living in Iowa, she was providing daycare for her youngest son, a toddler at the time. She continues to drive locally, when not feeling pain.

State agency assessed that he [sic] claimant's mental status resulted in mild limitations in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. Based on the claimant's own reports of variable attention and concentration they determined moderate cognitive restrictions (Exhibits 12F–13F). However, I disagree with state agency medical consultant, Dr. Wright's, opinion that the claimant has moderate cognitive restrictions with an objective examination conducted by psychologist, Dr. Straight who found no cognitive deficits and no deficits in memory, concentration or attention (Exhibit 8F). I give more weight to Dr. Straight's findings and opinion as he examined the claimant in January 2002 and Dr. Wright's assessment was based solely on claimant's subjective complaints and he did not indicate why he was disregarding Dr. Straight's medical findings and opinion.

Hence, I conclude that the claimant has mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation for extended duration. These limitations have no more than minimal effect on her ability to perform work activities. Her mild depression does not result in any marked limitations and is not compatible with the level of severity contemplated in section 12.04.

(Tr. 21–22). The ALJ found that Logston was capable of understanding, carrying out and remembering simple and detailed instructions; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting (Tr. 26).

The ALJ's determination regarding Logston's mental functional capacity is supported by the evidence in the record as a whole. The ALJ's decision to credit the opinion of Dr. Straight, who actually examined and evaluated Logston, over that of Dr. Wright, is not error and will not be disturbed.

### E. Logston's Credibility

In discrediting Logston's subjective complaints, the ALJ noted:

> The record evidence as a whole, considering all medical and non-medical elements, does not support the extent of the claimant's subjective complaints. Although the assertions of neck and back pain are reasonable to a degree, the overall record does not support them to the debilitating extent asserted. The claimant has consistently reported that she is in excruciating pain and cannot do anything. However, the record indicates that her pain may not be as debilitating as she has alleged. While living in Iowa, she was the sole day care provider for her youngest son, who was a toddler at the time. She has been living with her husband and both sons, here in New Jersey since about 2002 and reported to Dr. Linehan, in June 2004, that she gets up around 7:30 am and gets her two sons off to school, she drives them to school (Exhibit 25F). At the hearing, she used crutches for ambulation and testified that she had previously used a cane, however, there is no documentation that these assistive devices have been prescribed by any treating physician. While MRI scans show some disc space narrowing in the lumbar spine and a small to moderate disc herniation in the cervical spine, there is no evidence of any spinal impingement, stenosis or radiculopathy which would warrant the need for walking devices. Moreover, there is no evidence of muscle atrophy or weakness. She had an acute back strain in July 2000 with no evidence of any injury. While this may have initially caused a pain episode, her allegations that the pain continues at the same level of severity is not supported by objective medical evidence.

. . .

> Despite the claimant's complaints of debilitating pain she still manages to provide care to her two school age sons, including getting them to school in the morning. She has reported a workers' compensation settlement due to the injury in July 2000 and her complaints of depression and inability to work appear to be based, in large part, on her family situation. Moreover, her continued significant ingestion of narcotic medication (Exhibits 9F, 22F), for close to five years, is suspect and may very well be increasing sensitivity to pain.

(Tr. 23, 24).

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *Id.* at 1321–22. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel,* 240 F.3d 1145, 1147 (8th Cir.2001).

 However, "a claimant need not prove that he or she is bedridden or completely helpless to be found disabled." *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). *See also Keller v. Shalala,* 26 F.3d 856, 859 (8th Cir.1994) (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); *Forehand v. Barnhart,* 364 F.3d 984, 988 (8th Cir.2004) ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'") (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard complaints "solely because the objective medical evidence does not fully support them." *Polaski,* 739 F.2d at 1322. Furthermore, "[t]he [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations".

 The court will not disturb the ALJ's credibility finding. While the medical evidence demonstrates that Logston has issues relating to her back, it does not support her complaints of debilitating pain. Moreover, aside from Dr. Garofalo, whose opinion was properly discounted, no physician has ever opined that Logston was unable to work or should even restrict her activities. Logston actually continued to work at her customer service representative job for several months following her July 2000 injury, quitting for reasons unre-lated to her medical condition. As set forth above, she was encouraged by Drs. Kappos and Bahls to be more physically active and advised by Dr. Kopacz to wean herself off of the narcotic pain medication. Dr. Kopacz opined that Logston was not a surgical candidate, in part, due to her "symptom magnification." The record as a whole is inconsistent with Logston's subjective complaints.

Upon the foregoing,

**IT IS ORDERED** that the determination of the ALJ is affirmed and this matter is dismissed.